## WRIGHT vs. THE STATE.

1. JURY: *When error in overruling challenge cured.*
   A prisoner can not complain of an error of the circuit court in deciding incompetent jurors to be competent, and forcing him to a peremptory challenge of them, where the panel has been completed without his exhausting the peremptory challenges to which he was entitled.

| 35 | 639 |
| 58 | 362 |
| 35 | 639 |
| 62 | 554 |
| 35 | 639 |
| 63 | 583 |

2. NEW TRIAL: *Rejecting competent juror no cause for.*
   The erroneous rejection by the court, of a talesman, as a juror, is no ground for a new trial.

3.  SAME:  *Affidavits for must be in bill of exceptions.*
    Where affidavits are filed in support of a motion for new trial, they should
    be incorporated in the bill of exceptions, or referred to, identified, and
    made part of the record.

4.  SAME:  *Separation of jurors.*
    It is no abuse of the discretion of the circuit court to refuse a motion for
    new trial on the ground that the jury, before and after the final submis-
    sion of the cause, were permitted to sleep at night in separate rooms
    unlocked and unguarded, and that one of them, a colored man, was per-
    mitted to take his meals with other colored men in a separate room from
    the other jurors, when it is shown that there was an open door between
    the two rooms and the colored juror was under the observation of the
    sheriff and was not approached or talked to on the subject of the trial.

5.  SAME:  *Furnishing prisoner with list of jurors.*
    The Criminal Code makes no provision for furnishing a prisoner with a list
    of the jurors before the trial.

6.  EVIDENCE:  *Statements of defendant.*
    The fact that a prisoner, in a conversation with a witness, said something
    which the witness can not remember, will not exclude his testimony of
    what he does remember.

7.  INDICTMENT:  *Murder in first degree.*
    If an indictment contain all the allegations and technical requisites in a
    common law indictment for murder, the defendant may be convicted of
    either grade of murder or of a lower grade of homicide.

APPEAL from *Garland* Circuit Court.

Hon. JABEZ M. SMITH, Circuit Judge.

———, for appellant.

*Henderson, Attorney General, contra.*

ENGLISH, C. J.    On the second of November, 1878, Al-
bert Wright was indicted for murder, in the circuit court
of Garland county.    He was tried in February, 1880, on
plea of not guilty, the jury found him guilty of murder
in the second degree, and fixed his punishment at impris-
onment in the penitentiary for seventeen years.    A motion
for a new trial was overruled, and bill of exceptions taken.

He was sentenced in accordance with the verdict, and prayed an appeal, which was allowed by one of the judges of this court.

I. The twelfth assignment in the motion for a new trial is, that the court erred in deciding that H. F. Crim, C. R. Gwinn, Jackson Mathews and Wm. M. Stengler, were competent jurors.

It appears from the bill of exceptions, that H. F. Crim and C. R. Gwinn were severally challenged for cause by the prisoner. The challenges were tried by the court on examination of the jurors under oath, and the court found the jurors qualified, whereupon they were challenged peremptorily by the prisoner. The grounds of the challenges for cause were that the jurors had formed opinions, etc. The bill of exceptions also shows that when the panel of jurors was completed, the prisoner had used but seventeen of the twenty peremptory challenges allowed him by the statute.

It is not material to inquire whether the court correctly decided these jurors to be qualified or not. The prisoner got clear of them by peremptory challenges, and his peremptory challenges were not exhausted when the panel was made up.

The rule, as settled in this court, is that if, after the court has overruled the challenge of a juror for cause, the defendant elects to challenge him peremptorily, and the record shows that he did not exhaust his peremptory challenges, he can not complain of the decision here as error. *Benton v. The State, 30 Ark., 328; Meyer v. The State, 19 ib., 156; Stewart v. The State, 13 ib., 720.*

1. JURY: Error in overruling challenge, when cured

The bill of exceptions shows that Jackson Mathews was challenged by the prisoner for cause, and, being sworn, he stated that "he might have formed an opinion in the case

as to the guilt or innocence of the defendant; that he had no opinion now. That he had heard John Warford, a brother of the deceased, talk about the case in a store down town, next morning after the killing ; that he was talking to others, and he heard little of what was said, and paid little attention to it. That he could and would be governed alone by the law and the evidence in the case, and that he could and would give the defendant a fair and impartial trial as if he had never heard of the case."

Upon this statement, the court decided the juror to be competent, defendant excepted, and the juror was then accepted by the parties to try the case.

The prisoner did not get clear of this juror by peremptory challenge, but rested on his exception to the opinion of the court deciding him to be competent. (*Meyer v. State, supra.*) And we will inquire whether the court erred in this matter, notwithstanding the provision of the statute (*Gantt's Digest, sec. 1978*), that "the decisions of the court upon challenges to the panel, and for cause, and upon motions to set aside an indictment, shall not be subject to exception." *Palmore v. The State, 29 Ark., 248; Benton v. The State, supra.*

Challenges are tried by the court, etc. *Gantt's Digest, sec. 1917.*

" Actual bias, is the existence of such a state of mind on the part of the juror, in regard to the case or either party, as satisfies the court, in the exercise of a sound discretion, that he can not try the case impartially, and without prejudice to the substantial rights of the party challenging." *Gantt's Digest, sec. 1910.*

There was no abuse of the sound discretion of the court in deciding *Mathews* to be a competent juror. *Benton v. The State, sup.*

Wright vs. The State.

The bill of exceptions is silent as to Wm. M. Stengler.

II.   The thirteenth assignment in the motion for a new trial is, that the court erred in deciding A. P. Aldrich to be an incompetent juror.

It appears from the record entries of the trial, that after the regular panel of jurors for the term had been exhausted without making up a jury, A. P. Aldrich, and others, were summoned by the sheriff, under an order of the court as talesmen.   When Aldrich was called, it appears from the bill of exceptions that he was sworn to answer questions, and stated that he had formed an opinion as to the guilt or innocence of the prisoner from rumor; that such opinion was based principally upon what he read in the city [Hot Springs] papers; that he did not recollect whether it was a detailed statement or not; that he could and would discard from his mind any such opinion, and could and would, if a juror, decide the case alone from the law and evidence introduced on the trial.   Upon this statement the court declared him incompetent, and the prisoner excepted.

Whether the court was right or wrong in this, it is not material to decide, for if wrong, the erroneous rejection of a talesman would be no sufficient cause for granting the appellant a new trial.   He had no legal right to have that particular person as a juror.   The court might have excused the talesman from serving on the jury for any cause deemed sufficient in its discretion, without legal prejudice to appellant.   *Hurley v. The State, 29 Ark., 22.*

2. NEW TRIAL: Rejecting competent juror, no ground for.

III.   The fourteenth assignment in the motion for a new trial is, that three of the jurors—George McKnight, J. A. Jacobs, and R. A. Montgomery—were prejudiced against defendant at the time they were selected upon the jury, and had, previous to their selection, so expressed them-

selves in terms and effect; and, in support of this fact, defendant offered the affidavits of Calvin Davis, Bob Robbins and Jackson D. Page, and stated that the above information came to his knowledge since the trial.

There are four affidavits copied in the transcript, following the motion for a new trial, purporting to have been made by Jackson D. Page, L. G. Robbins, Calvin Davis and Jane Hunter, in relation to expressions made by the three jurors named above about the prisoner, shortly after John R. Warford was killed in August, 1878. The bill of exceptions makes no reference whatever to these affidavits. It merely states that on the twenty-fourth of February, 1880, the defendant filed a motion for a new trial, setting forth the grounds thereof; which was, on the same day, overruled by the court, and defendant thereupon excepted, etc.

3. ————: Affidavits for must be in bill of exceptions. Where affidavits are filed in support of a motion for a new trial, they should be incorporated in the bill of exceptions, or referred to, identified, and made part of the record.

If counter affidavits are filed, a like practice should be observed as to them.

All that the bill of exceptions shows about the three jurors named above is, that when they were called they were sworn to answer such questions as might be asked them touching their qualifications as jurors, and were asked the usual questions concerning their bias or prejudice, and whether they had formed or expressed an opinion touching the guilt or innocence of the defendant. To all of which questions they made answers satisfactory to the court and parties, and were declared competent by the court, and accepted by the parties as jurors.

A challenge to a juror must be taken before he is sworn

in chief, but the court, for a good cause, may permit it to be made.at any time before the jury is completed. *Gantt's Digest, sec. 1905.*

*Chapter LXXXI, Gantt's Digest*, prescribes the qualifications of jurors, and mode of selecting them in civil and criminal cases. By *sec. 3657* it is provided that: "No verdict shall be void or voidable because any of the jurymen fail to possess any of the qualifications required in this chapter, nor shall exceptions be taken to any juryman for that cause after he is taken upon the jury and sworn as a juryman."

In *Meyer v. The State, 19 Ark., 165*, commenting upon similar statute provisions, the court, by the Chief Justice, said: "The right to be tried by an impartial jury being guaranteed to the prisoner by the constitution, we are not prepared to say that a new trial should be granted in no case where it is discovered, after verdict, that one or more of the jurors were incompetent by reason of prejudice, * * * because cases might arise in which one or more jurors, who had prejudged the prisoner's guilt, might impose themselves upon the panel by concealment or perjury, notwithstanding the prisoner availed himself of all the privileges allowed him by law to obtain an impartial jury. In such cases the incompetent jurors would be guilty of a fraud upon the law, and it might be necessary to grant the prisoner a new trial, in order to give him a constitutional right, of which he had been deprived without fault or negligence on his part.

"But it would not be safe to hold that the prisoner, after conviction, could take the *ex parte* affidavits of persons out of doors to establish the prejudice of the juror, and bringing them into court, claim a new trial, absolutely, and as a

matter of right. * * * Such a practice might open the door for corruption and perjury.

".On the contrary, where such affidavits are filed in support of the motion for a new trial, on such grounds, the court might well have the persons who made them brought into court, for the purpose of ascertaining that the affidavits were fairly obtained, and that they were persons of credit, etc. It might, also, have the impeached juror called in for the purpose of affording him an opportunity of explaining any remarks attributed to him, as manifestations of his incompetency. And after ascertaining all the facts in relation to the matter, the court would necessarily have to exercise a sound legal discretion in disposing of the motion, as in applications for new trials upon other grounds."

There is nothing shown by the bill of exceptions in this case upon which we can decide that the court below abused its discretion, or erred, in refusing a new trial on the fourteenth assignment.

4. Separation of jurors. IV. The eighth assignment is, "That the officer in charge of the jury permitted them to separate during the trial of the case, and after a material portion of the evidence had been taken, without the consent of the defendant and contrary to the instructions of the court; in support of which fact the defendant offers the affidavit of ———."

The motion for a new trial was filed on the twenty-fourth of February, overruled on the same day, and the bill of exceptions signed on the twenty-eighth of the same month.

We find copied into the transcript an affidavit, purporting to have been made before the clerk, by J. H. Nichols, sheriff, on the twenty-eighth of February, four days after the motion for a new trial was overruled, and not noticed in the bill of exceptions.

Passing over, but not meaning to sanction such irregularities, we have considered the affidavit of Nichols as if filed before the motion for a new trial was overruled, and as if brought upon the record by the bill of exceptions.

He states, in substance, that, as sheriff, he had charge of the jury, etc. That during the progress of the trial the jury slept in four or five different rooms; that is to say, all of them were not required by him, or his deputies, to sleep in the same room, but they slept in different rooms, and some of the rooms in which they slept had no locks on the doors, and no officer staid in the different rooms with the jurors after they retired. That during the progress of the trial the jury were permitted to separate at their meals— that is to say, Jackson Mathews, a colored juror, ate in a separate room from the one in which the balance of the jurors ate, though there was a door between the two rooms, and Jackson Mathews sat near the door, and affiant could hear and see him all the time. Affiant frequently, during the trial, while the jury were at their meals, saw colored men dining at the same table with Jackson Mathews, though they did not talk about the case. The separations of the jury above spoken of, during the times of sleep and eating, occurred both before and after the final submission of the case to the jury.

The sheriff but conformed to a prevailing social custom in permitting the colored juror, Mathews, to separate from the white jurors in taking his meals; but the juror was under his observation, and he saw that he was not approached on the subject of the trial. There was no grounds for a new trial in the conduct of the jury. *Wilder v. The State,* 29 *Ark.*, 294.

There were no locks on the doors of some of the rooms in which the jurors slept, and the sheriff did not keep a

bailiff on guard at such doors during the night to watch for intruders. It is not to be presumed that persons, in violation of law, obtruded themselves into the rooms of the jurors, after they had retired to sleep, for the purpose of influencing their verdict.

The whole matter, however, was addressed to the sound discretion of the court below, and there was no abuse of such discretion in refusing a new trial for the causes stated in the eighth assignment. *Collier v. The State, 20 Ark., 50; Palmore v. The State, 29 ib., 248.*

2. ———: Furnishing prisoner with list of jurors. V. The seventh assignment is, that the prisoner was put on trial without being furnished with a list of jurors. The record shows that he announced himself ready for trial; the bill of exceptions is silent as to the list of jurors, and the present Criminal Code makes no provision for furnishing such list before trial. *Benton v. The State, 30 Ark., 344.*

VI. The sixth assignment is, that the court permitted the prosecuting attorney, over the objection of the defendant, to close the evidence of the state without calling and examining all the witnesses to the transaction whose names were indorsed upon the indictment, and who were summoned upon the part of the state.

This is a mere statement in the motion for a new trial. The bill of exceptions shows nothing on the subject except that the state closed after calling and examining eleven witnesses. The state was not obliged to call and examine all the witnesses whose names were indorsed on the indictment. If any of them, not called, were material witnesses for the defendant, he had the right to call and examine them.

VII. The first, second and third grounds of the motion for a new trial are, in substance, that the verdict was contrary to law and evidence.

The testimony is voluminous and conflicting. We have carefully examined the whole of it, but it will be sufficient to state the substance of the leading and material facts in evidence.

The indictment, in substance, charged that the prisoner murdered John R. Warford, in Garland county, on the first of August, 1878, by striking and thrusting him with a knife, or some other sharp instrument, in and upon the left side of his chest and near his heart, giving him a mortal wound, of which he then and there died, etc.

On the night of the thirty-first of July, 1878, John R. Warford, John Warford, Wm. Hausard, John T. Green and Pat Young, who were country people, were camped with their wagons not far from the graveyard, and near the street railway which runs down the Hot Springs valley, and out to the depot of the Malvern railroad. About 12 o'clock of that night John R. Warford was stabbed and killed, near the camp. The four other persons above named, who were camped with him, and not far from him when he was stabbed, were examined as witnesses by the state, on the trial, and gave, substantially, the same account of the matter.

Green testified, in substance, that their wagons were some twelve feet from the north edge of the street leading to the depot. Some of their party had been up town that night to see about selling their produce. After their return, some parties passed by the camp, walking along the street railway. William Hausard said to the woman, "Good evening, ma'am." She called out to Mr. Wright, saying, "Oh, Mr. Wright, these nasty, stinking sons of bitches are after me again." The party who answered to the name of Wright said, "If you don't let that woman alone I'll arrest you, or have you arrested immediately." At the time Hau-

sard spoke to the woman, he, John Warford and John R.
Warford were sitting on the north edge of the road, or
street, leading to the depot. The woman who called to°
Wright when Hausard spoke to her, was on the street-rail-
way track, going towards the depot, and the man who an-
swered to the name of Wright, who seemed to be twenty-
five or thirty steps behind the woman when she called to
him, was also on the street-railway track. After the man
answering to the name of Wright made his threats of
arrest, John Warford said to him, "We mean no harm;
we are camped here with our wagons." The woman
replied to him, "Oh, yes; I know you. I bought some
peaches from you this evening." John Warford responded,
"Of course you did." When these words occurred between
the woman, Wright and the campers, Pat. Young and wit-
ness were sitting on their wagon-tongue, ten or twelve feet
north of where the two Warfords and Hausard were sit-
ting, on the edge of the road. Witness and Young had a
candle burning at their wagon. About the time the woman
said " these nasty, stinking sons of bitches are after me
again," John R. Warford got up from the edge of the road
where he was sitting, and went off in an·easterly direction.
Witness watched him until he got behind his wagon. He
could not tell then which way he went. When Hausard
spoke to the woman on the street railway track, she did
not stop, but continued to walk pretty fast on towards the
depot. When the man who answered to the name of
Wright came up on the track to a point opposite the place
where the two Warfords and Hausard were sitting, he
made his threats of arrest, and continued to walk on down
the track in the direction the woman had gone for twenty-
five or thirty yards, when he left the track, and went across
the road leading to the depot and running along beside the

street-railway track in a northeasterly direction. Witness saw him until he got to the north edge of the road, or street, when he passed out of his sight. About the time he passed out of his sight, witness heard him say to some one, "What are you stopping a woman along the street here for?" John R. Warford said, "I haven't stopped your woman." The man then said, "Get back to your wagon, or I'll arrest you, or have you arrested immediately." About that time John R. Warford called to his brother, saying, "Oh, Jay! Come here!" John Warford and Hausard then got up and went to where he was. When they got there, one of them called to Young and witness, who were still sitting on the wagon-tongue, to bring a light. Witness took the candle to them, and found John R. Warford about five or six steps from a gum tree, lying on the ground, dying. From the sound of the man's voice who answered to the name of Wright, when he said, "What are you stopping a woman along the street for?" and the sound of the voice of deceased when he replied, "I haven't stopped your woman," they were close together at the time. Deceased, when he went to him with the light, was about thirty yards from the wagon of witness, and about the same distance from the street railway. It was dark, and witness did not see the man who answered to the name of Wright when the woman first called to him, but did see him about the time he got opposite the camp, on the street-railway track, and could see his bulk as he passed on. When he saw deceased lying on the ground, he noticed blood on the left side of his shirt. The inquest was held on the body next morning, etc.

John Warford stated some additional facts. When his brother called him, and he approached to where he was, he heard footsteps going off. On reaching his brother, he

said, "Them negroes have stabbed me." Found him squatted down against a gum tree. Picked him up and tried to carry him to the wagons. He took two or three steps, and sank down. Witness then called for a light, and on its being brought, he found he was stabbed a little below the left nipple, etc.

Prisoner and the woman who passed the camp before him were colored.

None of the camp witnesses identified the prisoner as being the person called Wright by the woman, but it was proved by his own witnesses that he passed the camp as stated by the camp witnesses, and threatened the campers with arrest for accosting the woman.

The camp witnesses stated in effect that the voice which threatened them with arrest at the camp, was the same which they heard in altercation with the deceased just before he called to his brother.

Several witnesses for the defense, who claimed to have been in company with the prisoner, testified that he did not leave the street-railway track after he passed the camp, but went on down it, etc.

There were many minor facts in evidence, bearing with more or less force on the issue. But the above statement is sufficient to show the character of the case, that the testimony was conflicting, and that it was the province of the jury, and not ours, to decide whether the weight of the evidence established the criminal agency of the prisoner in the death of Warford. If the jury had believed the witnesses for the prisoner, and disbelieved the witnesses for the state, they might have acquitted the prisoner.

6. EVIDENCE
Statement
of defend-
ant.

VIII. The eleventh ground of the motion for a new trial is, that the court erred in admitting the proof of the declarations of the defendant by George N. James, when

he stated that he could not remember all of said declarations.

The bill of exceptions shows that George N. James, the fifth witness examined on the part of the state, testified in substance as follows: That he had a conversation with defendant, Wright, on the night Warford was killed. That defendant came into the office of the Arlington hotel, where witness was at the time night watch, and defendant was head porter. Defendant came in that night and said a man had been killed down about the grave-yard. That he and John Cox had been down about the depot with some ladies—Mrs. Smith and others—and while on their way home with them they passed some campers near the grave-yard, and a man from the camp stopped Mrs. Smith, and she called to him, and when the man saw that Mrs. Smith had a man with her, the man that stopped her turned and went on down the railroad track, and in coming back along up the street-railroad track from Mrs. Smith's when they got to a point opposite a place where some men were camped, two men hailed them and asked if they were policemen. They said, "No." The man who hailed them then said, "There has been a man killed over here." That he and Cox went over and looked at him. Witness asked him how the man was killed. He said that he was cut or stabbed, and pulled a small knife out of his pocket, and said to witness, this is the only knife I have; "but just previous to pulling out his knife defendant said something else which I can not now remember, but I have stated the substance of his statement." Witness supposed it was between 12 and 1 o'clock when this conversation occurred. Defendant also said that after he and Cox left the body they came on up town; that they met James R. Ford, a

policeman, and James Nash, and told them of the man's having been killed down by the grave-yard.

After the defendant had cross examined this witness, and after all of the witnesses for the state had been examined in chief, and the state had closed, defendant moved to exclude the whole of the testimony of the witness, for the reason stated in the eleventh ground of the motion for a new trial, and the court overruled the motion.

It is competent for the state to prove any voluntary confession or admission of the accused, tending to establish his guilt. But if one part of a conversation is relied on, as proof of a confession of the crime, the prisoner has a right to lay before the court and jury the whole of what was said in that conversation. *1 Greenleaf, sec. 218.*

The statement or confessions of the party to be affected must be delivered to the jury as they were made; certain facts can not be extracted and detailed to the jury, and other parts withheld. *Coon v. The State, 13 Sm. & Mar., 250.*

Where the confession of a party is given in evidence, the whole, as well that part which makes for him as that which is against him, must be taken together, and go to the jury as evidence in the case. But, like other evidence, it must be weighed, and believed or disbelieved, in whole or in part, as reason may decide. *Brown's case, 9 Leigh, 634.*

In this case, there was no attempt on the part of the state to violate the rule. The witness James was permitted to state all that the prisoner said to him in the conversation referred to, as far as he could remember it. Before pulling out his knife, prisoner said something else which the witness could not remember, but he stated, he said, the substance of the prisoner's statement. The fact that prisoner said something which witness could not remember, and which might happen in any case where a witness under-

takes to repeat a conversation with a party after consider-
able lapse of time, may have lessened the weight and value
of the evidence, but was not ground to exclude it from the
jury.

IX.   The fourth assignment in the motion for a new
trial is, that the court erred in refusing instructions moved
for defendant, numbered one, eight, nine, eleven and twelve,
and the fifth is that the general charge of the court was
contrary to law.

The bill of exceptions shows that the prosecuting attor-
ney moved ten instructions, some of which were given,
and others refused by the court, but no objection appears
to have been made on the part of the prisoner to such of
them as were given.

The general charge of the court is set out in the bill of
exceptions, but it is not stated that any objection was made
to it, or to any part of it, nor has the counsel for the pris-
oner in his brief here, specified any part of it that he deems
erroneous or objectionable.   The charge is long, but plain,
just to the state and fair to the prisoner.   It is made up of
familiar principles, and it would not be useful to copy it.

For the prisoner thirteen instructions were asked, and
all of them given except the first, eighth, ninth, eleventh
and twelfth, and for one of them a substitute was given,
but for which, the bill of exceptions fails to show.

(a).   The first instruction asked for the prisoner, and re-
fused, follows:   .

"That the grade of the offense charged in the indictment
being for murder simply, the jury, in considering the case,
can not find the defendant guilty of murder in the first
degree, but of one of the lower grades of that offense only,
and not of such lower grade unless they are satisfied, be-
yond a reasonable doubt, that all the ingredients of fact

7.   INDICT-
MENT:
Murder.

necessary to constitute such offense, and the defendant criminally connected therewith, have been proved."

Appellant was not convicted of murder in the first degree, and if the court erred in refusing the instruction, he was not prejudiced by the error.

But the instruction was based on a mistaken view of the indictment.

Sufficient allegations of, in first degree. It commences thus: "The grand jury, etc., accuse Albert W. Wright of the crme of murder, committed as follows, to-wit." But in the body of the indictment the offense is charged to have been committed " feloniously, willfully, deliberately, and of his malice aforethought, and with premeditation, etc.," thus employing all the words used in the statute defining murder in the first degree. *Gantt's Digest, sec. 1252.*

Moreover, it contained all the allegations and technical words requisite in a common law indictment for murder, and under such an indictment the accused may be convicted of either of the statute degrees of murder (though there are some decisions to the contrary), or of a lower grade of homicide. *McAdam v. The State, 25 Ark., 405.*

Here it may be remarked that there was a demurrer to the indictment because it did not specify the grade of offense with which defendant was charged, and the court overruled the demurrer.

(*b*). The eighth instruction, which was refused, follows:

" The burden of proving everything essential to the establishment of the charge against the defendant lies on the state, and evidentiary facts must *all* be proved, and the existence of none of them can be *presumed;* and if the jury believe the evidentiary facts in this case have not all been proved, they will acquit."

It is not probable that the jury would have understood

the meaning of the expression "*evidentiary facts*" as used in this instruction, if it had been given, or that it would have afforded them any light, or been any guide to them in making up their verdict.

We are not sure that we rightly understand what was in the mind of the learned counsel who drafted the instruction, when he employed the words "*evidentiary facts.*"

The word "*evidentiary*" was introduced, or coined, by Mr. BENTHAM, and, as used by him, is defined in *Burrill's Law Dictionary*. Mr. BURRILL uses the word in his work on *Circumstantial Evidence, page 3*, in a sense which he explains, and in a note gives Mr. BENTHAM the credit of introducing it and other words, which he pronounces uncouth and uncalled for.

Some of the writers on Code-pleading divide facts into two classes—principal facts, such as must be averred in the pleadings, and *evidentiary* facts, such as need not be averred, but must be introduced as evidence to prove the principal facts alleged in the pleadings.

An instruction which the jury might not understand, and which might mislead them, should not be given. The court, in its general charge, sufficiently and plainly instructed the jury as to what facts the state should prove to establish the guilt of the prisoner of any one of the grades of homicide embraced in the indictment.

(*c*). The bill of exceptions states that the court modified instruction No. — so as to read as follows:

"The hypothesis of the guilt of the defendant must flow naturally, reasonably and necessarily from the facts proved, and be consistent with them all, and inconsistent with any other reasonable hypothesis or supposition, or the jury will acquit."

42

This language is copied as instruction numbered nine in the defendant's series, and is noted "given" in the margin. So it must have been instruction No. 9, as offered for defendant, that the court modified to read as above. We can not tell whether the court erred in making such modification, because the instruction, as proposed, does not appear in the transcript. The instruction as modified appears unobjectionable.

(*d*). The eleventh instruction offered for defendant, and not given by the court, follows:

"It is the rule in criminal cases when circumstantial evidence is relied upon as a medium of proof, that the issue shall be determined upon the strength of the evidence of the state, and not the weakness or absence of evidence for the defense."

The burden of proof is on the state where the plea is not guilty, in all criminal cases, whether circumstantial or direct evidence be relied on; and the court, in its general charge, distinctly and plainly instructed the jury that the law presumed the defendant to be innocent, and that this presumption continued until the state proved his guilt, etc.

(*e*). The fourteenth instruction follows:

"In proving the admissions, declaration or confession of defendant, the prosecution is held to prove all the declarations made on the given occasion, or such testimony must not be considered by the jury."

This instruction is noted as inapplicable, and refused.

James was the only witness that proved any confession or statement of the prisoner, and in considering the *eleventh* assignment in the motion for a new trial, we have stated the rule relating to the proof of admission, etc. The court

having overruled the motion to exclude the testimony of James, the instruction, as framed, was properly refused.

X.   The ninth and tenth assignments relate to the same character of matter.   The counsel for the prisoner attempted, in the examination of several witnesses, to raise a suspicion that a man named Gleason was connected with the killing of Warford, which the court ruled out, and we think properly, as too remote.

Upon the whole record, we find no error of law for which the judgment should be reversed.

Affirmed.