BROWN *v.* STATE.

5131                                         395 S. W. 2d 344

Opinion delivered November 8, 1965.

[Rehearing denied November 29, 1965.]

910

*E. V. Trimble,* for appellant.

*Bruce Bennett,* Atty. General, By: *Reg. E. Wallin,* Asst. Atty. General, for appellee.

CARLETON HARRIS, Chief Justice. Appellant, Walter Lonnie Brown, was convicted of murder in the first degree by a Jefferson County jury, which fixed his punishment at death in the electric chair. The information alleged that Brown killed Mrs. Hester Wares by shooting her with a pistol, while perpetrating the crime of robbery. Mrs. Wares was shot on July 15, 1964, and died the next day. From the judgment entered in accordance with the jury verdict, appellant brings this appeal. For reversal, appellant lists nine separate points, and the motion for new trial contains thirty-one assignments of error, though some of these overlap with the listed points. Pursuant to our procedure in capital cases, we have examined each point argued, and each assignment set out in the motion for new trial, as well as each objection made during the course of the trial.

We first proceed to a discussion of the evidence upon which the conviction was based. Raymond Jones, Jr., testified that he, Walter Brown (appellant herein),

Howard Brown, Jessie Anderson, and Joe Nathan Nelson, were together on the night of July 15, 1964. They had met as Geneva, Arkansas, and had planned to drive to Mississippi. The group was traveling in a 1956 two-tone Buick, owned by Howard Brown. According to Jones, they came to Pine Bluff about 11:30 that night, and appellant, together with Joe Nelson and Howard Brown, got out of the car for the purpose of robbing the Trio Liquor Store, located on Highway 65 in North Pine Bluff. All three were armed with 22 pistols. Nelson remained outside the store near a phone booth, and the two Browns went inside. When they returned to the automobile, Nelson asked appellant if he had shot the woman in the store, and the latter replied, ''Yes.'' Jones stated that money was taken in the robbery, but he did not know the amount. The men then drove to Walter Brown's house in Little Rock, where they divided the money, and commenced gambling. The witness stated that he received $12.00, and that the others also received part of the money. Jones said that Walter Brown turned a short-barrel 22 pistol[1] over to him the next day, and he in turn gave it to the officers at the time of his apprehension. The witness also testified that, though all were drinking, none were drunk.

Officer Edward Shipman of the Pine Bluff police force testified that he and Officer Holland passed the liquor store after midnight, during their patrol, and, noticing that the lights were still on in the building, went inside to investigate. They found Mrs. Wares lying on the floor behind the counter, and in the doorway of an adjoining room. She stated that two colored men, one tall, and one short, had come into the store, and that she had been shot by the tall one. An ambulance was called, and Mrs. Wares was removed to the hospital.

Dr. Joseph Robinette testified that he examined Mrs. Wares, and, during surgery, found that she had been severely injured from a bullet wound; he stated that she subsequently died as a result of that wound.

---

[1] The pistol is properly described as a 22 caliber German Rohm 6-shot revolver.

Dr. Frank Reed, Jefferson County Coroner, testified that he removed a small bullet from the body, and that her death was the result of a gunshot wound through the abdomen.

Buddy Garner, an employee of a movie theater near the liquor store, testified that he left his work around 11:30 on the night of July 15, and, while passing the Trio Liquor Store, saw someone run and jump into a '56 Buick, which was two-tone in color and which was occupied by several people.

Bulah Smithy, another employee of the liquor store, obtained Mrs. Wares' clothing at the hospital, and turned same over to Night Chief William Howard of the Pine Bluff Police Department.

Appellant was arrested in Little Rock on July 19 by Henry Atkinson, an investigator with the Criminal Investigation Division of the Arkansas State Police. Brown was taken to the Little Rock Police Department, and turned over to Sergeant W. A. Tudor of the State Police. Tudor testified that he talked with Brown, first advising appellant that he had a right to have an attorney, and further advising that Brown did not have to make any statement whatsoever. Tudor said that he made no promises to appellant, and did not abuse, threaten, or intimidate him in any manner. Appellant denied any knowledge of the killing, but admitted traveling to Pine Bluff, and participating in a robbery of the liquor store. Appellant said that he was not armed, but was present ''when the woman fell to the floor.'' Brown stated that he had gone to Pine Bluff in Howard Jones' two-tone Buick. The officer said that appellant had been in custody about an hour and a half when he talked with him.[2] Subsequently, R. D. Bentley, a lieutenant of the

[2] On the same day that Brown was arrested, a hearing was held before the Judge of the Little Rock Municipal Court, Criminal Division, and following the hearing, Brown was turned over to Pine Bluff officers. Thereafter, still on the same day, Brown was charged with first degree murder in the Pine Bluff Municipal Court, and a hearing was held, the clerk testifying that the docket reflected, "Walter Lonnie Brown, first degree murder, the defendant advised of his constitutional rights, and attorney appointed for him, a preliminary hearing held and on the proof the defendant is bound over to the grand jury without bond."

Little Rock Police Department, together with Detective Goodwin, located two expended cartridge hulls at Brown's home.[3] These officers turned the cartridges over to Major Paul McDonald of the Arkansas State Police.

Officer William Howard, Assistant Chief of Police in Pine Bluff, talked with Brown on July 21. Chief Howard testified that Brown was not intimidated or abused, nor made any promises of immunity from prosecution. Accompanied by Deputy Sheriff Buck Oliger, Officer Howard and Brown started to the liquor store. On the way, Brown said that he would like to change his statement; that he was the one who shot the lady in the store, and that he shot her with his short-barrel 22 pistol. The appellant pointed out the liquor store, and described where the car had been parked. The officers then went inside with Brown, and appellant detailed how the crime was committed. According to Officer Howard:

"* * * He said that he walked into the liquor store turned to the left, which would be the north side of the liquor store and someone in his group asked for a fifth or some kind of liquor and the lady turned to go to the shelf, shelves of liquor which would be at the right of the storeroom door on the top shelf and he said the lady reached up on that shelf as she was going to get the fifth of liquor and that's when he went behind the counter and grabbed the lady from behind with his left hand over her mouth and he said that must have excited the lady because she jerked away from him as though she was excited and she had the bottle of liquor over her head and then he stepped back about two feet, he said, and pulled his gun, a short barrel gun, from his belt and shot the lady. * * *"

Brown then asked where the money was, and Mrs. Wares first stated that the boss had taken it to Little Rock, but when asked again, she replied that all the money was in the cash register.

---

[3] Information had been given to the officers by Nelson, and Nelson and Brown accompanied the officers to the premises. Brown's mother was told that they would like her permission to look for some expended cartridges, and she, along with her son, granted this permission.

Major McDonald of the State Police, a ballistics expert, after explaining the manner of conducting tests, testified that he had made tests with the pistol turned over to him by Officers Atkinson and Crump, and that, in his opinion, the fatal bullet had been fired by this 22 caliber, short barrel gun. He also testified relative to the dress that Mrs. Wares had been wearing, and stated that an examination of the hole in the dress showed that the gun was fired at close range. Deputy Sheriff Buck Oliger of the Jefferson County Sheriff's Office, testified that Brown had been advised of his constitutional rights, i.e., he did not have to tell the officers anything, and he did not have to go with the officers to the liquor store to show how the robbery took place.

Appellant took the stand in his own behalf, and admitted that he had shot Mrs. Wares, but stated that the gun "went off."

From the testimony:

"A. * * * Howard went in first and when I came in she already had her back turned, she never did see my face, by the time I walked in the door Joe Nelson was right behind me and I walked in, walked right on to the left and walked right on behind the counter.

Q. In other words, you went around this counter behind the counter?

A. Yes sir, right around the end.

Q. What did you go around there for?

A. I was going to hold her.

Q. You were going to hold her and then the other boy, Howard Brown was going to take the money out of the cash register?

A. Either Howard or Joe, I don't know which one.

Q. Then what happened?

A. And when I reached her she had her right hand on a fifth of whiskey and was reaching around the door after the cigarettes. When I reached at her she turned around and when she turned around she started coming out

with the fifth of whiskey and my hand went up like that and I pulled the gun out and when I pulled the gun out it went off.

Q. You didn't pull the trigger to make it go off?

A. No sir.

Q. You mean, you are saying it was a total accident, is that right?

A. Well, I wouldn't say it was an accident or not 'cause, (interrupted)

Q. You mean you were then shooting at her to kill her?

A. No, no, I wasn't intending to shoot her. I was just going to pull her back, see, I knew she was a woman and I could handle her, but I had been drinking pretty heavy and when I pulled the gun out it went off."

The evidence was clearly sufficient to sustain the conviction.

The first four points raised by appellant all relate to the question of race prejudice, and are as follows:

1. Members of petitioner's race were intentionally, deliberately and systematically limited in the selection of petit jury panels.

2. Petitioner is a Negro and members of his race were deliberately and intentionally discriminated against in the selection of petit jury panels.

3. The jury commissioners allowed race to be considered as a factor in the selection of the petit jury panels.

4. The jury commissioners made no special effort to acquaint themselves with Negroes who were quailified for jury service.

The allegations under these points are completely without any foundation in the record, and it is puzzling as to why counsel raises points without any semblance of proof to support his position. There is absolutely *no evidence* that Negroes were "intentionally, deliberately

and systematically limited" in the selection of the panel. Again, there is absolutely *no evidence* that the jury commissioners allowed race to be considered in selecting the petit jury panel, nor any evidence that they made no effort to acquaint themselves with Negroes qualified for jury service. The record reflects no objection to the manner in which the panel was selected, and no attempt to show that the jury commissioners practiced discrimination. None of the jury commissioners were called to testify on this point, nor did appellant offer evidence from any other source relative to the allegations here made. The record does not even reflect the names of the jury commissioners, and further, does not disclose how many Negroes were on the jury panel. As stated, the transcript is completely barren of any evidence on these points, and they apparently were listed only as a matter of "form."

Point No. 5 asserts that appellant's confession was coerced and involuntary. Here, again, no argument is presented, nor reference made to any portion of the record which might substantiate this allegation. As a matter of fact, it is apparent that appellant was given every protection that the Constitution affords, and *appellant himself,* who took the stand and testified, does not charge that he was coerced into making any statement. In fact, his only testimony concerning any sort of intimidation was a reference to Officer Roy Lewis, of the North Little Rock Police Department. Brown, in his testimony, stated that Lewis asked him about some robberies that had occurred in North Little Rock, and he (Brown) told him that he did not know anything about them. According to appellant, Lewis said that he was lying, and the officer started threatening him:

"* * * I told him that he wasn't going to make me say anything that, tell a lie on myself and he said that he would make me say I shot my mother if he wanted me to. I looked at him and gave him a smile. He got upon the table to hit me and another detective walked in and then both of them walked out.* * *

"Well, there was another officer that came in at the time he did he came back in and he had a long yellow sheet of paper and he read off some more robs and asked me did I do them and I told him 'naw' and he said it wouldn't be no use in lying that he would find out whether I did or not and I told him 'naw' I didn't do it and then Officer Tudor came in and asked me did I want to talk it over with him and he told me about everything I said would be held against me and all that.* * *"

Sergeant Tudor testified that he did not see anyone threaten appellant, but, at any rate, if threats were made as related by Brown, no prejudice resulted, for appellant stated that he did not tell Lewis anything. Admittedly, Brown was advised by Tudor that he did not have to make any statement; Tudor likewise said that he told Brown he had a right to an attorney, and that no promises nor threats, of any nature, were made. Officers Howard and Oliger, likewise, testified that no force or threats were employed as a matter of getting Brown to show them how the crime took place.

The evidence is uncontradicted that the statements were made free from duress. In addition, Brown admitted the killing, in open court, before the jury. It is true that he stated the gun "went off," but he very readily testified that the killing took place while he and his companions were engaged in robbing the liquor store, and this, of course, under our statute, constitutes first degree murder. There were some variances in his testimony from the statements made to officers, but they were not material. For instance, he stated that he did not show the officers the route followed before the robbery; that he did not "grab her," but only "reached to grab her;" that:

"* * * And when this fellow said that he had the bullet and the lead that came out of the gun, he was lying. Q. The officer was?

A. Whoever said that he had the shell that the lead came out of. I put that bullet in my mouth and chewed it up, that's why I know he was lying. The gun had six shells in it, when I got to my house I took my little finger nail

right here, pulled the shell out and put it in my mouth and chewed it up and spit it out into the bathroom, and the other two shells were found down by the cedar chest.''

It appears from the transcript that the holding in *Jackson* v. *Denno* [decided on June 22, 1964], 378 U. S. 368, was complied with. In that case, the United States Supreme Court said that, prior to submitting any confession to a jury, the court must first hold an evidentiary hearing, and determine for itself that the confession is voluntary. If the court finds that it was involuntary, then, of course, the confession is excluded; if, on the other hand, the court finds that the confession was voluntarily made, it is then submitted to the jury for their consideration, along with other evidence. Before the officers were allowed to testify before the jury as to statements made by appellant, the court first took evidence in chambers as a matter of determining if the confession was free and voluntary. While the court did not flatly state, ''I find the statements voluntary,'' the transcript shows, at Page 150, that, after hearing evidence as to voluntariness, the court said, ''Okay, the statement will be admitted.'' This appears to be an independent determination by the court, and, at the conclusion of the case, the court instructed the jury in regard to statements made by Brown.[4] Furthermore, as previously

---

[4] The court's instruction No. 11 was as follows: "The Court has admitted in evidence confessions alleged to have been made by the defendant. If you believe from the evidence beyond a reasonable doubt that these confessions were made by the defendant, voluntarily, without any hope of reward or fear of punishment, you should consider them along with all the other evidence in the case in determining the guilt or innocence of the defendant. If you are not convinced from the evidence beyond a reasonable doubt that they, or any of them, were voluntarily made, then those confessions, or any of them, should not be considered by you for any purpose whatever." Actually, this instruction went further than was necessary, under *Jackson* v. *Denno,* for the court, having determined that the confession was voluntary, left only the question of the weight or credibility of the confession to be passed on by the jury. However, defendant cannot complain that the jury was also instructed to pass on the question of voluntariness, as this phase of the instruction, if having any effect at all, could only inure to his benefit. The failure to distinguish between the issue of voluntariness, and that of credibility, is discussed in Footnote 13, *Jackson* v. *Denno, supra.* "A finding that the confession is voluntary prior to admission no more affects the instructions on or the jury's view of the reliability of the confession than a finding in a preliminary hearing that evidence was not obtained by an illegal search affects the instructions on or the jury's view of the probativeness of this evidence.

stated, appellant admitted the killing while testifying during the trial.

It is next asserted that the court erred in refusing to permit appellant to use all of his twelve peremptory challenges. Appellant had only used ten challenges when the jury was finally completed and selected. While the jury was being sworn, counsel for appellant suddenly announced that he desired to exhaust all of his challenges. No reason was given for this request, and it was denied, the court stating:

"The entire jury panel had been selected before any indication was made and while the Clerk was in the act of swearing in the jury the attorney interrupted the court with the statement that he wanted to exhaust all of his challenges without giving any reason and the jury having been selected the motion will be denied."

This ruling is fully in accord with our prior holdings. In *Jones* v. *State,* 166 Ark. 290, 265 S. W. 974, decided in 1924, this court said:

"It is the opinion of the majority that no error was committed in refusing to allow appellant to challenge peremptorily the two jurors who had been accepted. This question was recently considered in the case of *Brust* v. *State,* 153 Ark. 348, and we there quoted from the case of *Allen* v. *State,* 70 Ark. 337, as follows: 'Under the statutes of this State persons summoned as jurors, when called to serve in criminal cases, may be examined under oath touching their qualifications. As each one is called, he is first examined by the State, and then by the defendant, and, after each examination is completed, if the juror is found by the court to be competent, the State shall challenge him peremptorily or accept him; if accepted by the State, the defendant shall challenge him peremptorily or accept him. *Lackey* v. *State,* 67 Ark. 416.

"The failure to distinguish between the discrete issues of voluntarines and credibility is frequently reflected in opinions which declare that it is the province of the court to resolve questions of admissibility of confessions, as with all other questions of admissibility of evidence, the province of the jury to determine issues of credibility, but which then approve the trial court's submission of the voluntariness question to the jury."

Each party must challenge or accept in the order named when the court declares him competent. After he is accepted by both parties, he cannot be challenged peremptorily, without permission. The court, for good cause, may permit the challenge to be made at any time before the jury is completed. Sand. & H. Dig., §§ 2202-2217.'

"It is the opinion of the majority that appellant should have stated to the court the reason why he desired to challenge the jurors, after having accepted them, and that it was not sufficient to state merely that he had discovered reasons for believing that the jurors would not be competent. The court has a discretion in these matters, and a reversal will be ordered only where an abuse of this discretion is shown, and no abuse is shown when the accused fails to apprise the court of some fact or circumstance which has caused him to believe that an accepted juror is not acceptable. Where this is not done the court cannot know that appellant is not acting capriciously."

See also *Cascio* v. *State,* 213 Ark. 418, 210 S. W. 2d 897. This is in line with the general rule which is stated in 50 C. J. S., "Juries," § 282, as follows:

"Ordinarily there is no right to challenge a juror peremptorily after the juror or jury as a whole has been sworn to try the case or after the ceremony of swearing is begun."

Here, no reason at all was given for the sudden change of mind, and it may be that counsel made this motion in order that he might later attack the composition of the jury.[5] There was no error in the court's ruling.

[5] Under our cases, a defendant cannot complain of the composition of the jury if he does not exhaust his challenges. In *Benton* v. *State,* 30 Ark. 328, decided in 1875, Chief Justice English pointed out that this rule had stood as a precept of criminal practice in this state for a period of over twenty-two years. A cursory examination of our cases reveals over thirty-five criminal cases in which this rule has been cited and adhered to. *Wright* v. *State,* 35 Ark. 639; *Glenn* v. *State,* 71 Ark. 86, 71 S. W. 254; *Keese & Pilgreen* v. *State,* 223 Ark. 261, 265 S. W. 2d 542; *Johnson* v. *State,* 97 Ark. 131, 133 S. W. 596; *Morgan* v. *State,* 169 Ark. 579, 275 S. W. 918; *Rutledge* v. *State,* 222 Ark. 504, 262 S. W. 2d 650; and *Kurck* v. *State,* 235 Ark. 688, 362 S. W. 2d 713.

It is contended that the trial court erred in permitting Dr. Robinette to testify as to the treatment he administered to Mrs. Wares after she was shot, and it is also asserted that the court erred in permitting Dr. Frank Reed, the Coroner, to testify relative to an autopsy that he had made on the body of Mrs. Wares. Appellant does not point out the particular testimony he objects to, nor are these points argued by appellant. Certainly evidence as to Mrs. Wares' condition after the shooting, and the cause of death was material and pertinent to the charge, and both of these witnesses, medical physicians, were competent as experts to testify.

Under Point 8, of "Questions Presented," and Assignment No. 14 in the motion for new trial, it is asserted that the court erred in permitting the witness, Buck Oliger, to testify as to oral statements made to him by the defendant. Assignment 11 also asserts error in permitting Chief Howard to so testify. As previously stated, appellant had already been advised of his constitutional rights, prior to making the statements, and there is no contention that he was mistreated in any manner. Our previous discussion as to the confession covers this point.

Under Point 9 of his motion for new trial, appellant contends that the court erred in permitting Raymond Jones, Jr., to testify that, when appellant returned to the automobile after the robbery, he stated that he had shot the woman. We have held many times that statements and admissions by an accused, from which an inference of guilt may be drawn are admissible in evidence against him. This declaration against interest was voluntarily made, and it is not contended otherwise. See *Dearen* v. *State,* 177 Ark. 448, 9 S. W. 2d 30.

It is contended that the court erred in permitting the state to introduce five photographs as exhibits. These are simply photographs of the exterior, and interior, of the Trio Liquor Store. These photographs could well have been an aid to a better understanding of some of the evidence, and we certainly cannot see how the pictures could have been prejudicial.

It is also asserted in the motion for new trial that the court erred in permitting the dress, shell case, bullet, and pistol to be introduced into evidence, appellant complaining that none of these items were taken off the person of Walter Brown. Counsel did, however, state, "No objection to the dress, Your Honor." We do not agree that any error was committed. While the shell case, bullet and pistol were not taken from Brown, it was established that these items had been in the possession of defendant. Raymond Jones testified that appellant turned the pistol over to him the day after the killing. The bullet was removed from the body of Mrs. Wares, and the shell hull was found at Brown's home, in the presence of appellant. The state's testimony showed every link, step by step, in the chain of evidence from the possession by appellant to the possession of the articles by Major McDonald of the State Police. Of course, all of these items were relevant to the murder charge, since the bullet was removed from the body, and, according to the evidence, had been fired from the gun introduced, it being established that this pistol was in the possession of appellant at the time of the homicide. It is also alleged that there was error in permitting Major McDonald to show the jury the bullet hole in the dress. This testimony was, however, pertinent to the case in that it corroborated the evidence that Mrs. Wares was shot at close range.

Point No. 15 in the motion for new trial alleges that the trial court erred in giving to the jury upon the court's own motion, written instructions Numbers 1 through 15, inclusive. A general objection only was made to these instructions but all have been examined, and we find no prejudicial error.

Point No. 17 asserts that Ark. Stat. Ann. §§ 43-1921 and 43-1922 (Repl. 1964) are unconstitutional. This is a most unusual contention, in that on the one hand, appellant has stated that he was denied his twelve peremptory challenges to which he was lawfully entitled, and now on the other hand, he asserts that the statute is unconstitutional. Section 43-1921 allows the state ten peremptory challenges in capital cases, and 43-1922 allows the defend-

ant twelve peremptory challenges in capital cases. The point is not argued, and it is difficult to comprehend what this assignment has reference to; apparently this is tied in with appellant's Point 9, which asserts that ''The court erred in permitting an all-white jury to try the defendant on murder in the first degree, and not sustaining defendant's motion for a mistrial, because no Negroes were permitted to serve on his jury.'' Appellant is evidently contending that a Negro defendant is entitled to have a Negro serve as one of the twelve members of the jury that hears the case. This contention was passed on adversely to appellant's allegation in the case of *Swain* v. *State of Alabama*, 380 U. S. 202. It was there also asserted that appellant's rights under the Fourteenth Amendment were violated, because the Negroes on the petit jury panel were stricken by the state through peremptory challenge. After stating, ''The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry, and without being subject to the court's control,'' the court, in an opinion by Mr. Justice White, went on to say:

''* * * In the quest for an impartial and qualified jury, Negro and white, Protestant and Catholic, are alike subject to being challenged without cause. To subject the prosecutor's challenge in any particular case to the demands and traditional standards of the Equal Protection Clause would entail a radical change in the nature and operation of the challenge. The challenge, pro tanto, would no longer be peremptory, each and every challenge being open to examination, either at the time of the challenge or at a hearing afterwards. The prosecutor's judgment underlying each challenge would be subject to scrutiny for reasonableness and sincerity. And a great many uses of the challenge would be banned.

''In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's chal-

lenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it. Hence the motion to strike the trial jury was properly denied in this case.''

There are some other allegations of error, and various objections to rulings of the court during the trial; however, most of the objections have been covered in our discussion of the several assignments of error. At any rate, we have carefully reviewed and considered every assignment, and every objection, throughout the record, and find no merit in appellant's contentions, nor any erroneous ruling.

Affirmed.