## WHITEHEAD VS. WELLS.

| 29 | 99 |
|----|-----|
| 63 | 532 |
| 29 | 99 |
| 64 | 167 |

1. RATIFICATION: *Evidence sufficient to establish.*

   Where the evidence shows that the defendant, an attorney, having for collection a claim of the plaintiff, without his knowledge collected the same in Confederate money and loaned it to a third party, who afterward became bankrupt, taking a note therefor payable to the plaintiff, who afterward received from the defendant the receipt of other attorneys to whom the note had been delivered for collection, and after having kept it a few days and made inquiry about the drawer, returned it and demanded the money of the defendant; and tended to show that an agent who had been sent by the plaintiff to look after his claims, upon being informed of the transaction, had expressed himself as satisfied with it: *Held,* that the jury might well have inferred a ratification of the defendant's acts, if not from the conduct of the plaintiff in recovering the receipt, at least, from that of the agent in assenting to the transaction.

2. AGENCY: *Notice to the agent, etc.*

   The principal is affected with notice of all his agent knows in the line of his duty or the scope of his powers.

3. STATUTE OF LIMITATION: *Between attorney and client.*

   While it is true that an action cannot be maintained against an agent or attorney for money collected by them, until after demand and refusal to pay, or neglect of the attorney to notify the client of the collection; yet, if the client has notice, he must make demand in a reasonable time, and if he neglects to do so when he could, with ordinary diligence, have known of the collection, he puts the statute of limitation in motion. [See *Jett, Ex'r, v. Hempstead, Ex'r,* 25 Ark., 462. — REP.]

4. STATUTES: *Time of taking effect under constitution of* 1868.

   Under the provisions of sec. 22, art. VIII of the Const. of 1868, an act of the legislature that did not fix the time it should take effect, was not in force until ninety days after its passage.

5. JURORS: *Mode of determining the qualification of.*

   The provisions of the constitution of 1868, prescribing the qualification of jurors, did not take from the legislature the power to direct in what manner the question of qualification should be determined by the courts; and sec. 25, ch. 98, Gould's Dig., regulating this

matter, is not in conflict with the constitutional provision, nor was it abrogated by the code of practice prior to the amendments of 1871.

6. CODE OF PRACTICE: *How far it repealed prior statutes.*

The code was only intended to change the forms of action, and abolish the old forms and modes of procedure, and in all other cases wherein it was silent the provisions of Gould's Digest continued to operate until repealed.

7. JURORS: *Time of objecting to.*

An objection to the qualification of a juror must be made before he is sworn and impaneled. It comes too late on motion for new trial, even though the cause of the disqualification may not have been discovered earlier.

APPEAL from *Drew* Circuit Court.

Hon. HENRY B. MORSE, Circuit Judge.

Before the Hon. DAVID WALKER, J., and Hon. S. W. WILLIAMS and J. L. WITHERSPOON, Sp. J J. — the Hon. E. H. ENGLISH, C. J., and W. M. HARRISON, J., being disqualified.

*English & Ford*, for appellant.

*A. H. Garland, contra.*

WILLIAMS, Sp. J. The plaintiff brought suit against defendant in the Drew circuit court, on the 8th of March, 1871. In the complaint he states that about the 6th day of June, 1861, plaintiff, with one James H. May, employed defendant and his law partner, who is not sued, as attorneys and "agents" to collect and receive moneys for him from various persons, to be paid over to plaintiff. That May, on or about the 11th day of May, 1862, assigned and transferred his right in said claims in the schedule exhibited to plaintiff; that the defendant, as such attorney, received money from divers persons, whose names, and the date of the receipt and the amount received are set out in a schedule attached to the complaint, which sums amounted to nine hundred and forty-five dollars

and eighty cents. That after deducting all credits, there was due the plaintiff the sum of six hundred and forty-seven dollars and fifty cents; that the plaintiff, from 1861 to the year 1871, was a resident of the state of Missouri, and up to the 29th day of September, 1868, he did not know that the defendant had collected the money claimed, and avers demand of the money on the last named day, and a refusal by defendant to pay.

The defendant answered. In the first paragraph, he states that the money mentioned in the schedule attached to the complaint, as collected on the 28th day of September, A. D, 1863, of N. R. Davis, was Confederate money, and was collected in Drew county, Arkansas, about the 28th of September, 1863; set up at length the existence of the late war, and that the money was received under military coercion ; that Drew county was under the military authority of the Confederate States at that time; that the money was received by defendant's partner under military orders requiring Confederate money to be received for all debts, and that a refusal would have subjected the recusant to arrest; and May '& Whitehead, being at the time nonresidents of the state, and not present to be counseled by him, or to assume the responsibility of refusing to obey the said order, defendant's partner accepted from Davis the amount of the note in Confederate money. This, as shown by all the pleadings and evidence, is the real and only matter in dispute.

The same paragraph of the answer contains the further allegation that defendant's partner well knew that he could not enforce payment against Davis, who was about leaving the state; that to secure the matter and prevent the loss of the money, he accepted the amount of Davis' note in Confederate money, and loaned the same to one Fletcher, who was at the time reported to be, and regarded as a man of wealth and sol-

vency, and took a note payable to May & Whitehead, drawing ten per cent. interest from date; that Fletcher had since become bankrupt, and the debt, without fault of defendant, has been lost. This paragraph concludes with an averment that all other sums collected had been duly paid over.

To this paragraph in the answer, plaintiff demurred, and the court sustained the demurrer, as to which no question is before us. The complaint and this part of the answer, however, present, as clearly developed in the proof, the real difference between the parties. The case really presents a contest as to who shall bear the loss of Fletcher's insolvency, which seems to have occurred after the loan of the Confederate money to him.

The second defense contained in the answer is the statute of limitations of three years, which presented one of the issues upon which the case was tried.

The third defense of the answer is, that the amount sued for was received in Confederate money; that in the fall of 1865, May, who, before that time and afterwards, with the full knowledge of plaintiff, was writing to said defendant and acting as one of the owners of said claims, and equally interested with plaintiff in the same, fully ratified and agreed to what had been done in collecting and loaning the Confederate money. This paragraph formed the second issue that was tried.

There was a fourth paragraph, stating in a shorter and different form the allegations of the second, and concluding with a general denial of having received money. To this fourth paragraph a demurrer was sustained, and, on leave, defendant filed an amendment containing a general denial of having received money for plaintaiff. This formed the third and last issue.

The case was tried by jury, which rendered a general ver-

dict for defendant. The plaintiff filed his motion for a new trial, stating therein as grounds for the same:

1. The verdict is not sustained by sufficient evidence.

2. The verdict is contrary to the evidence on the trial.

3. The verdict is contrary to the law and instructions of the court.

4. Irregularity in the jury; that one of the jurors named Ralph had not been in the state six months, and was not a qualified elector, and this fact was unknown to plaintiff at the time and during the trial. That Ralph had erroneously responded in the affirmative, when asked as to his qualifications on being impaneled, not knowing that it required six months residence to become a qualified elector. . The motion is sworn to by the attorney of plaintiff and by plaintiff, at least both signatures are attached to the motion, and the clerk places below the usual jurat, "sworn to and subscribed," etc. It is not presumed, however, that the counsel intended to swear to all the grounds of his motion. Although very informal, we will treat it as an affidavit to the facts set up in the fourth clause of the motion. Plaintiff excepted and filed his bill of exceptions, which contains all the evidence.

The first cause for new trial is that the verdict is not sustained by sufficient evidence. Let us first see what the verdict is responsive to. Plaintiff avers that defendant collected money; that, defendant denies. Whether proof that confederate money was collected by defendant will sustain an allegation of money in the complaint, becomes a question, which in the view we take of this case, it will be unnecessary to decide.

The two remaining issues, to which the verdict responds favorably to defendant, either of which concludes the case, are, first, Did plaintiff ratify the collection and loan of the confederate money to Fletcher; second, Had three years elapsed since the cause of action accrued?

In order to correctly determine this, let us examine the testimony.

Plaintiff, as a witness, stated that he delivered the claims to defendant and his law partner for collection; that May transferred his interest to plaintiff by indorsement on the schedule of the claims. May knew as much or more about the business than plaintiff did and he got him to come to Drew county as plaintiff's agent. He came back without any money; plaintiff did not remember his saying anything about Harrison, and Wells, the defendant, loaning any money. Schedule A, in the complaint, is the receipt Harrison and Wells gave plaintiff; came to Monticello the fall before the trial (which was the fall of 1870) and saw defendant; he gave him receipt on Van Gilder, Jones, and Bell & Carlton; plaintiff demanded a statement of accounts between them; defendant gave it. He then exhibits the statement, in which, among other matters, plaintiff is credited with cash from W. R. Davis, six hundred, thirty-seven dollars and fifty cents, and is charged with commissions on same, $63.75, and amount of Fletcher's note, $563.75, which with the undisputed cash payment balanced the account. Plaintiff, says further, I objected to the note of Fletcher in the statement. He gave me a receipt for the Fletcher note to Bell & Carlton. I gave the receipt back to him. I told him I would look to him for the money. I told him I was not satisfied and would sue him. I never knew he had collected the W. R. Davis note till I came down here in the fall of 1870. He may have written to me, but I have forgotten it. I lived in Missouri. May was only my agent. He sold out to me when he went to the war. He had only authority to receive money. I wrote letters in the name of May & Whitehead in order to "particularize" the business. When Mr. May returned he reported no bad faith on the part of Mr. Wells, but that he,

Wells, said that he thought that he could, after a while, make money on the claims. I demanded the money of Wells for the Davis note. In 1865, I lived in St. Charles, Missouri, and May lived there. In 1865, I got May to come to Monticello as my agent, to collect any money that he could. May and I have been in business together, and he may have written letters in the name of May & Whitehead. May had no authority to pay money for me, and I know nothing of his having paid any. In the fall of 1870, when I came to Monticello, Wells gave me a receipt of Bell & Carlton for the Fletcher note. I went to their office in Pine Bluff, and inquired about Fletcher, but did not present the receipt. I heard at Monticello that Fletcher was a bankrupt. I said nothing to Wells about taking the Fletcher note until I came back from Pine Bluff. I then went to Mr. Wells and gave him the receipt for the Fletcher note. I never received any statement of accounts from Harrison and Wells. May and I lived in the same town after the war. I told Mr. Wells last winter I was not satisfied. I knew nothing of these matters until I came down last fall. The following letters are in the handwriting of May. This letter is signed May & Whitehead, is dated February 8, 1867. It referred to the compromise of a claim, and says the debtor misunderstood May's proposition, and he, May, could not make any positive arrangement with a heavy discount until he saw Mr. Whitehead, but offering to discount 25 per cent. This letter being signed May & Whitehead, and being in reference to the claims of that firm, and May having refused to finally act until Whitehead was consulted in a grave matter, but proposed to act alone on a matter of less moment, and had a tendency to prove facts involved in the issue as did three other letters written by plaintiff to defendant.

In the first, dated July 18, 1865, plaintiff makes inquiry

direct as to the claims of May & Whitehead, and asks if any thing has been collected, and says he wants to come down and settle.

The second letter is dated September 18, 1866, one year and two months after the other. In it plaintiff makes no allusion to the former letter; no complaint is made that no answer was received to it. It leaves on the mind a strong impression that knowledge had been received from defendant in the meantime. It is in this style: I drop you a few lines. I would like to know what success you are having collecting May & Whitehead's notes and accounts. Have you collected anything, or have any prospect of collecting anything, or how much do you think our claims are worth. I would like to know what the prospect is. Please let me hear from you as to what you can collect, and how soon it can be come at. The letter of 1865 is to know whether anything is collected; evidently from a man in the dark. The letter of 1866 is from a man who knows that a work is in progress, who asks, "what success are you having."

The third letter is dated January 4, 1867, a few months after the last. This letter acknowledges a receipt for a check for money received from defendant on collections, refers to the claim of which May had written, and says, Mr. May says he never agreed to settle their claim at 33⅓ cents on the dollar, referring to the claim of Owen, Shorter & Co., about which matter May had written. He concludes the letter: "Mr. Wells, I think it would be a good idea to take new notes in the place of the old ones in case they can't pay them, and make them more secure, if possible, where they are doubtful." All three of these letters, except the one of 1866, were signed May & Whitehead; that of 1866 was signed A. J. Whitehead.

Plaintiff further testified, that Mr. Wells refused to pay.

When May returned in 1865, his agency ceased. All I ever authorized him to do was to collect the money. Wells asked me to take the Fletcher note for the amount of the Davis note. I was not willing to do it, and refused.

Defendant testified : In 1861, May & Whitehead were tobacco peddlers, and left claims in the hands of Harrison & Wells. In 1865, May came to Monticello, and I think had our receipt with him. I never knew of any transfer of our receipt until this suit was begun. When May was here, I showed him our books. I told that I had collected the Davis note in confederate money. He expressed himself well satisfied. He went with me to my house and stayed with me. I knew of no dissatisfaction until Whitehead came down here last fall. I cannot say that I answered the letter of May & Whitehead, written in 1865, but I am satisfied, from my usual course of business, that I wrote to them about that time, stating my transaction in this matter. May was here in 1865 and examined my books in which my transactions were entered, and expressed his approval. I never knew anything of the transfer of our receipt until this suit was commenced. I have letters from both parties since, written in the firm name. I told May, in 1865, what I had done with the Davis note, and he expressed himself well satisfied. I am not positive that May had Harrison & Wells' receipt in 1865, but from a memorandum in his hand writing on the receipt about the Stroud note, I think he did. The other memoranda on the receipt are in my hand writing, were made last fall, when Whitehead was here. I took the Fletcher note in 1863, before I heard from May & Whitehead.

From this evidence the jury could well infer the ratification of the collection of the Davis note in confederate money, if not from Whitehead's act of receiving the claim, and returning it after he had visited Pine Bluff, and inquired for Fletcher,

the evidence, at least, tends to prove that May was White-
head's agent and ratified the act; and the verdict upon this
issue does not, at least, shock our sense of justice; and the
finding on this issue would be sufficient to settle the case.

Upon the statute of limitations, the testimony warranted
the conclusion that May came, in 1865, with full power to
demand and collect the money of defendant; that he had full
knowledge of the collection of the Davis note.      Whether
Whitehead had actual notice or not, which from the evidence
the jury might well infer, yet he is affected with notice of all
his agent knew in the line of his duty or the scope of his
powers.

While it is true, as directed by this court in the case of
*Jett v. Hempstead*, 25 Ark., 462, that an action cannot be
maintained against an attorney or agent for money collected
by them as such, until demand and refusal to pay over, or
neglect of attorney to notify his client of the collection; yet,
as decided in that case, if the client has notice of the col-
lection, he must make his demand in a reasonable time.   If
he neglects to do so, he puts in motion the statute of limita-
tions, and if the client could, with ordinary diligence, have
known of the collection, the statute will begin to run after
the lapse of a reasonable time for demand.   In this case,
passing by the question whether the proof of the collection
of confederate money sustains the allegation of the complaint,
that money was collected, we think the jury was warranted
in finding, that from 1865 to a period anterior to three years
before the bringing of this suit, was an unreasonable delay,
and the statute of limitations had run its bar, and that,
whether May was agent or not, a fact as to which, to the extent
of demanding pay for collections, there is no question.  For,
from the testimony and letters, and residence of the parties,
etc., the jury might have inferred direct, personal knowledge

Whitehead vs. Wells.

in Whitehead; or, at least, if he failed to possess such knowl-
edge, might infer that lack of diligent inquiry which would
excuse delay.

We therefore hold, that the first ground of the motion for a
new trial is not well taken.

The second ground of the motion is disposed of in the first;
for if our conclusions are true, the verdict was not contrary to
the evidence.

The third, that the verdict is contrary to law,˙is also dis-
posed of. That part of it which claims that the verdict is
against the instructions of the court, it will be unnecessary for
us to pass upon, further than to say, that the court below
gave all the instructions which plaintiff asked, and refused all
defendant asked; and if that court did not feel sufficiently
aggrieved to set aside the verdict, we find nothing in the case
to warrant us in so doing, unless we find it in the fourth ground
for a new trial.

At the time of this trial, April, 1871, no person was allowed
or qualified to sit on any jury who was not a qualified
elector. Const. 1868, art. XV, sec. 20. On the 27th of
March, 1871, the general assembly passed a law amending
the code of civil and criminal practice. By section 407 of
amended criminal code, it is provided as follows : " No verdict
shall be void or voidable because any of the jurymen fail to
possess any of the qualifications required in this chapter ; ˙nor
shall exceptions be taken to any juryman for that cause, after
he is taken upon the jury and sworn as a juryman." This
chapter of amendments in 406, contains the same provisions
as to the qualifications of jurors as that contained in the con-
stitution. See Act of 1871, pp. 268, 269. This section,
although an amendment to the criminal code, is general and
touches the qualifications of jurors and verdicts in all cases as
to this matter, and might conclude this question, if we find

that it does not involve a constitutional right of litigants, and if the legislature, notwithstanding the constitution, has the power to prescribe the time and mode of concluding the question of qualification of jurors.

Although section 407 was passed on the 27th day of March, 1871, it contains no provision regulating the time it must take effect; therefore, under the provisions of sec. 22, art. V, Const. of 1868, this law did not go into effect until ninety days after its passage. We are therefore compelled to decide this case upon the general principles of the common law, or by previous legislation anterior to 1868, as we find nothing on this subject since.

Sec. 25, ch. 98, Gould's Digest, provides that no exception against any juror on account of his citizenship, nonresidence, age, or other legal disability, shall be allowed after the jury are sworn. Under this section this court has heretofore held that such objections were too late after verdict. If this law was in force at the time of the trial of this case below, it is conclusive of the question.

Art. XV, sec. 11, Const. of 1868, provides that all laws not inconsistent with the constitution are continued. Was the provision of sec. 25, ch. 98, in conflict with the constitution? We think not. The constitution prescribed a general qualification for jurors, as Gould's Digest had prescribed in sec. 22, ch. 98. Each required citizenship. The constitution calls him an elector. Gould's Digest describes him as a free white male citizen of this state, above the age of twenty-one years, a resident of the county, which fully describes the elector of that period, before the constitution of 1868. We must therefore presume that the makers of the constitution of 1868 were familiar with the law, and intended to provide simply for the qualification of those who should sit on juries, leaving the law to stand, and left it as regulated by the legislature as to the

time and mode of taking advantage of the disqualification. If the provisions in sec. 25, ch. 98, Gould's Digest, are inconsistent with the constitution, then the act of 1871, above cited, is unconstitutional and void, for it would likewise be inconsistent, and the legislature, under the constitution of 1868, never could have regulated the practice upon this subject. It is proper that those who sit on juries to enforce the laws should be those who vote in making them. As a general proposition this is correct. But, because the constitution of 1868 regulated this, that it thereby intended to take away from the legislature forever the power of so regulating the time and manner of settling the question of qualification, is not to be presumed. There must be a mode of concluding all questions, or governments could not exist. Therefore, to say that, by providing for the qualifications of jurors, it was intended to prohibit the legislature from setting the question of the qualification of each juror at rest, when he is examined as to his qualification, and impaneled and sworn, is, to say the least of it, an extensive stretch of the provision, and a construction which we cannot admit.

We think the constitution having prescribed the qualification, the legislature has the constitutional power to determine how the question of qualification shall be determined. It follows that if section 25 be law, the question of qualification is concluded when the jury are impaneled and sworn. The code of practice did not abrogate this section. The code was intended only to repeal and change the actions and suits, and abolished the old forms and modes of procedure in them. But in all cases other than this, wherein it is silent, the provisions of Gould's Digest are law until repealed, or changed by amendment, or inconsistent legislation, or expressly; and this view is fully sustained by the action of the very competent gentlemen who have had charge of the matter of digest-

ing our laws. If we doubted our conclusion on this subject, section 341, Civil Code, would put it to rest. For with this section the provisions regulating the impaneling of the jury open by providing that the mode of summoning juries is not changed, etc. Section 348 also empowered the court to decide all challenges for cause before the list is drawn, and the few sections following section 341, leave many steps in the practice of getting juries and their management, etc., unprovided, and without a reference to laws outside of the Code, we could never have gotten a jury. All of which shows that the Code was not intended to repeal laws upon this subject, which were consistent with it.

Plaintiff cannot be allowed to raise a question on motion for new trial for the first time. We hold that if the question is not sooner raised, it is waived.

Finding no error in the record, judgment of the court below is in all things affirmed with costs.