## WILLIAMS *v.* STATE.

Opinion delivered March 6, 1897.

CONFESSION—ADMISSIBILITY.—The decision of the question whether or not a confession was voluntary devolves upon the trial court, and its discretion will not be controlled by the supreme court unless it is abused.

PRACTICE—CHALLENGE OF JUROR AFTER ACCEPTANCE.—Under Sand. & H. Dig., § 2213, providing that "the challenge to the juror shall first be made by the state, and then by the defendant, and the state must exhaust her challenges to each particular juror before such juror is passed to the defendant for challenge or acceptance," it is an abuse of discretion in a murder case to permit the state to interpose peremptory challenges to jurors who have been accepted by both parties after the defendant has exhausted his peremptory challenges, in the absence of any showing that defendant was not prejudiced.  (RIDDICK, J., dissenting.)

Appeal from St. Francis Circuit Court.

H. N. HUTTON, Judge.

*John Gatling* and *N. W. Norton* for appellant.

1.  The indictment is uncertain.  Sand.  & H. Dig., sec. 2077; 27 Ark. 493; 26 *id*. 323; 34 *id*. 265; 54 *id*. 549.

2.  It was error to allow the state to challenge peremptorily, without showing cause, the jurors McDaniel and Casteel after they had been accepted.  Sand. & H. Dig., secs. 2203, 2213; 32 N. E. Rep. 1105; 137 N. Y. 29; 15 S. E. Rep. 556; 19 S. E. Rep. 797; 58 Ark. 361; 4 S. W. Rep. 86; 12 So. Rep. 582; 12 So. Rep. 688; 18 Can. S. C. 407; 7 So. Rep. 337; 10 At. Rep. 794.

3.  The confessions of defendant were not admissible.  50 Ark. 305.

*E. B. Kinsworthy*, Attorney General, for appellee.

1.  The indictment charges but one offense.  It contains all the requisites of a good indictment.

2. There was no error in excusing the jurors; and appellant was not prejudiced. There were no valid objections to any juror that tried the case. He had no right to any particular juror. He was only entitled to an impartial jury, and there is no contention that the jury was an impartial one. 58 Ark. 360; 44 Ark. 117; 30 *id.* 328, 343; 35 *id.* 639.

3. Whether the confessions were admissible or not was a question for the court to pass on, and there was no abuse of discretion. 28 Ark. 121; *ib.* 531; 50 *id.* 305.

BUNN, C. J. This is an indictment for murder in the first degree, found by the grand jury at the March term, 1896, of the St. Francis circuit court, and tried and determined at the September term, 1896. The trial resulted in the conviction of the defendant of murder in the first degree as charged, and judgment, and in due course defendant appealed. To the indictment defendant interposed a demurrer, and the same was overruled by the court, and exceptions were taken and noted.

The crime was committed in the night of the 23d October, 1895, at the home of the deceased, Grant McGowan, and as to the circumstances attending the the homicide the testimony of Maggie McGowan, wife of the deceased, may here be copied from the bill of exceptions, and is as follows: "I know Bill Williams, the defendant. He married my husband's sister. I am the wife of Grant McGowan. He is dead. He was shot He was shot in the bed with me and the children; shot in the head. He was shot through the top of the head. My husband went to bed about 8 o'clock. I went to bed a little after 9. He slept in the southwest corner. I was right by the side window. I heard a noise at the window before I went to bed, but did not pay any attention to it. When I went to lay down, I heard a noise

like a cat scratching. The light was turned down low. I did not hear any other noise. I had so often heard noises that I paid no attention to it. One standing on the ground could not see in, after I fixed the curtain. The blaze of fire was the first thing I saw on the pillow. I called my husband, I reckon, a dozen times. I laid my hand on him and shook him, and then I heard the blood dropping on the floor. Then I called Swartz, the hired man. When Swartz came in the room, I told him I believed my husband was dead, and he said, 'No, No.' He then turned up the light, and went out into the hall, and fired a pistol. Ben Thomas came in, I believe with sister. Bill Williams came. He was there about an hour. This was on the 23d day of October, 1895, and in this county and state. I know my husband and the defendant, Bill Williams, were not very friendly. They had fallen out about some cotton. Williams' wife was dead then. He had six children. My husband had charge of the place. Bill Williams had just moved there in the spring." On cross-examination she said : "I did not hear the gun fired; it did not wake me. The defendant's children are yet living; two in Tennessee. Mr. Freeland has one. The baby is two years old. Bill Williams' wife died last April a year ago."

R. L. Freeland testified, also, as follows : " I know the defendant. Grant McGowan is dead. I never looked at the wound very particularly. He was shot in the head. The top of his head was shot off. His brains bespattered the head of the bed, and the ceiling of the room overhead. He died from the effects of the wound. The piece of canvass which was tacked over the broken pane of glass in the window, in the north end of the room, was cut horizontally and perpendicularly, and it was also burned. When I got there, the yard was full of men standing around and talking. McGowan was

washed and dressed then. The defendant was there. I talked with him. I asked him if he had any idea who it was that killed McGowan, and he said he had not. He stayed there most of the day. I said something about getting blood hounds. I wanted it known that I was going to get blood hounds, thinking that some one might leave and give a clew. Defendant and I married sisters. There was a pane of glass out of the window, and a piece of canvas was over it. The canvas looked like it had been cut, and it was burnt. At the head of the bed I found some shot holes in it. It was about a month before defendant was arrested."

This was substantially all the testimony in the case, except the confessions of the defendant testified to by some of the witnesses, which, if admissible, might be sufficient to justify a verdict of the jury, if they were properly instructed in relation thereto. The inadmissibility of these confessions in evidence is brought in question by the defendant.

<span style="float:left">Admissibility of confessions.</span> "The rule of law applicable to all cases only demands that the confessions should have been made voluntarily, and the evidence to this point is addressed to the judge trying the case, who admits or rejects them, as appears right in his discretion, and his judgment is not a subject of reversal unless arbitrarily abused." *Runnels* v. *State*, 28 Ark. 121.

Most of the cases touching the subject, which have been adjudicated in this court, have involved the admissibility or weight of the testimony of accomplices testifying as to the confessions of the defendant, and for that reason are not strictly applicable.

The general rule as laid down by Wharton in his work on Criminal Evidence (sec. 658) is : "The real question is, whether there has been any threat or promise of such a nature that the prisoner would be likely to tell an untruth from the fear of the threat, or

hope of profit from the promise." The proper answer
to this question in any case determines the question
whether or not the confessions were voluntarily made,
and this determination devolves upon the court trying
the case; and it is said by all that this discretion of the
trial court to determine it will not be controlled by the
appellate court, unless it is abused. The evidence of
the confessions, like any other evidence, ought neverthe-
less to be the subject of appropriate instructions to the
jury, so that they can consider and pass upon the weight
of this evidence, and whether or not it is entitled to any
weight. Thus it is said in *Ray* v. *State*, 50 Ala. 104, a
defendant may show that his confessions, detailed in
evidence by witnesses, were uttered in jest. This is
only an illustration, for there may be many circumstan-
ces surrounding the making of a confession which may
very much effect the confession, and these are for the
consideration of the jury under instructions.

As to the admission of the evidence of the confes-
sions, we see no reason to disturb the ruling of the trial
court. There were no objections to the instructions of
the court, and they were therefore not copied in the
transcript, and we cannot say how far they went to
cover the evidence of the confessions. All we can do is
to suggest that proper instructions should be given the
jury in that regard.

In the course of the formation of the jury, L. O.
McDaniel of the regular panel was accepted by both <span style="font-variant: small-caps">Right to<br>challenge<br>juror after<br>acceptance.</span>
parties, and took his seat in the jury box, he being the
second juror accepted. On the next day, after about
forty more persons had been examined, and seven more
jurymen were selected therefrom, making nine, accepted
up to that time, on the motion of the prosecuting attor-
ney, he was permitted to challenge McDaniel peremp-
torily, and he was then discharged from the jury, leav-
ing eight in the box. Thereafter J. B. Casteel was

accepted by both parties, and took his seat in the box; and subsequently, several persons having been examined, and two of them having been accepted and taken their seats in the box, making ten, on motion of the prosecuting attorney, he was allowed to peremptorily challenge the said Casteel, and he also was thus discharged, leaving nine jurymen accepted. At this time the defendant had exhausted his twenty challenges, and could not exercise the right of peremptory challenge, as to the number of persons from among whom the three remaining jurymen were to be selected. The defendant had properly excepted to the discharge of the two that had been accepted, and this is made a ground for reversal.

The impaneling of juries is a matter largely in the discretion of the trial court, and this discretion will not be controlled where the statute has been substantially complied with, and where it appears that there is no error prejudicial to the defendant. Furthermore, this court has had several occasions to say that no one is entitled to the services of any particular person as a juryman, and in ordinary cases we have found that, even where errors have been committed in the impaneling of juries, they have seldom been considered as prejudicial errors.

Our statute provides that the state shall have ten, and the defendant twenty, peremptory challenges in felony cases; and "the challenges to the juror [whether for cause or peremptory] shall first be made by the state, and then by the defendant; and the state must exhaust her challenges to each particular juror, before such juror is passed to the defendant for challenge or acceptance." Section 2210–2213, Sand. & H. Dig.

It is said, referring to a section of the law enacted before the adoption of the code, in *Whitehead* v. *Wells*, 29 Ark. 99, that "an objection to the qualification of a juror must be made before he is sworn or impaneled."

There is no reason why the same does not hold good in cases of peremptory challenges. Indeed, there is greater reason for the rule in the latter cases. Where the court refuses to sustain a challenge for cause, and the defendant then makes a peremptory challenge, and does not thereby exhaust his peremptory challenges, he cannot avail himself of the error in not sustaining the challenge for cause. *Benton* v. *State*, 30 Ark. 328. Nor can a defendant "complain of an error of the court in deciding incompetent jurors to be competent, and forcing him to a peremptory challenge of them, when the panel has been completed without exhausting the peremptory challenges to which he was entitled." *Wright* v. *State*, 35 Ark. 639. All these decisions recognize the propriety of leaving to the trial court an enlarged discretion in the matter of impaneling juries, and yet, in every case which has come under our observation, whether or not the defendant has exhausted his peremptory challenges has been made a matter of importance, and we have failed to find a case where the error complained of has been held not prejudicial, where jurors are yet to be selected, and the defendant had exhausted his challenges.

In South Carolina where the statutes are much like our own, a controversy arose as to the point in the course of the examination of a juror beyond which the privilege of the state to retract an acceptance of, and to make a peremptory challenge to, a juror would cease. On this subject the supreme court of that state said : " The second question raised by appellant involves the practice in the courts of general sessions in this state, as far as fixing the period, in the ceremony of presenting a juror to the prisoner, beyond which a prosecuting officer cannot exercise the right of peremptory challenge to a juror. There is no statutory regulation governing the matter. It belongs to that class of cases where the practice long established in this state may be said to

furnish the rule. Really, it would seem, from the nature of the case, that any period preceding the announcement by the prisoner of his acceptance of the juror should be sufficient, for, if the prisoner is once allowed to announce his acceptance of the juror by saying to the clerk 'swear him,' the right of challenge by the state is precluded." *State* v. *Haines*, 15 S. E. Rep. 556. In that state, it seems, the jurors are sworn severally as each one is accepted. The case is not strictly in point, because of a difference in custom in the two states, but it shows the importance attached to the matter.

In the case at bar, the basic fact of the defendant's contention is that the state asked to be allowed to make the challenge, without assigning any reason or cause whatever for the change in the composition of the jury selected that far. As has been said, the courts in this state are accorded the largest discretion in such matters; but whenever it becomes necessary to exercise a discretion, ought it not, in cases like this, to be exercised upon cause shown, rather than arbitrarily? We would not assume to control the discretion of the trial court in determining a matter of this kind, presented to it upon a showing that the due administration of the law demanded that the juror be discharged, provided the change was made on conditions that would prevent detriment to the defendant.

It is true that we cannot certainly say just how the discharge of these jurymen was prejudicial to the defendant. Indeed, we may not be able to say positively that it was prejudicial to him at all; but at the same time we cannot say that it was not detrimental to him, and in fact we are rather inclined to think it was. But this uncertainty is, of itself, a strong argument against the propriety of such a procedure; and, in view of the fact that the defendant is condemned to suffer capital

punishment, we are unwilling to sanction such a doubtful method of selecting the jury that has convicted him. He is entitled to the benefit of his twenty challenges, and nothing that smacks of restricting or curtailing that right should be allowed to influence the result of his trial.

The demurrer to the indictment, was properly overruled, and, as other errors complained of will probably not occur on a new hearing, we deem it unnecessary to say anything concerning them.

Reversed and remanded.

Wood, J. I concur in the judgment, because the manner of challenging jurors, as disclosed by the record, was contrary to sections 2213 and 2193, Sandels & Hill's Digest, and prejudicial to appellant.

Riddick, J., (dissenting.) It is said by this court in *Maclin* v. *State*, 44 Ark. 117, that "the erroneous rejection of one who is summoned for jury service lays no sufficient foundation for a new trial." The same principle has been announced in many other cases decided by this court. *Vaughan* v. *State*, 58 Ark. 361, and cases cited. The reason for this rule is that a defendant has no right, before the jury are sworn, to be tried by any particular juror. All that he can demand is an impartial jury; and in order that such a jury may be secured, and the right of both the state and defendant protected, it is essential that the presiding judge should be entrusted with a large discretion in the matter of rejecting from the jury those whom he may deem improper or incompetent to serve as jurors.

There is nothing here to show that the defendant was not tried by an impartial jury. The jury had not been sworn, and he had no vested right to be tried by the rejected jurors. Even if it be conceded that their rejection was improper, still this, of itself, does not, in

my opinion, justify this court in reversing the judgment, for it is not shown that any prejudice resulted to defendant. Thompson & Merriam on Juries, sec. 271, and cases cited.