COLLINS *v.* STATE.

4177 143 S. W. 2d 1

Opinion delivered July 8, 1940.

—PAGE 1028]

 █

*O. W. Wiggins, Kenneth W. Coulter* and *Edward H.* *Coulter,* for appellant.

*Jack Holt,* Attorney General, and *Jno. P. Streepey,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, C. J. In consequence of a shortage of $22,896.86 in the accounts of L. B. Branch, sheriff and collector for Pulaski county, appellant was indicted on five counts charging embezzlement of amounts aggregating $980.97. Upon conviction prison sentences of 21 years were assessed on each count—a total of 105 years. The judgment was that each sentence should be reduced to 15 years, and that they should run concurrently.

To reverse, 25 alleged errors are assigned. These have been grouped under the following headings:

(1) The court erred in overruling the demurrer of defendant to the amendment to the indictment.

(2) The court erred in denying the motion of defendant to require the state to elect (as to each count of the indictment) whether it sought to charge the defendant as "chief deputy sheriff" or "deputy collector."

(3) The court erred in overruling the demurrer of defendant to the bill of particulars filed by the state in this cause.

(4) The court erred in appointing, over the objection of defendant, members of the state police to serve at the trial, in lieu of the sheriff and his deputies, and in qualifying said members in the absence of defendant.

(5) The court erred in overruling the motions of defendant to disqualify the jury panels.

(6) The court erred, after defendant had exhausted all of his peremptory challenges, and after the regular jury panel had been exhausted, and after eleven jurors had been selected by both sides, qualified and seated in the box, in permitting the state to exercise a peremptory

challenge as to C. C. Hester, one of the members of the jury so selected, qualified and seated, and in excusing said juror from service in the case.

(7) The court erred in admitting evidence of alleged numerous separate and independent offenses, not connected in any manner with the specific offenses charged, and not set out in the bill of particulars, there being no general scheme or design alleged or claimed to which evidence of such alleged additional offenses could be addressed.

(8) The court erred, during the course of the trial, in denying the request of counsel for the defendant that they have permission to use in the cross-examination of witness Joe Bond the audit or memoranda prepared by said witness and used by him in his direct examination to refresh his memory as to numerous items, and from which he testified.

(9) The court erred in refusing to permit defendant to show by witness Bond, on his cross-examination, that he had made an audit of the bank account of the sheriff and collector, who was shown to have had access to the funds of the office, including the funds alleged to have been embezzled, and to have withdrawn certain of said funds in an irregular and illegal manner, and that such audit showed that after deducting his salary and the proceeds of his borrowings for 1937 and 1938, he deposited in his bank account approximately $37,000 during that period.

(10) The court erred in overruling the separate requests of defendant, at the close of all the evidence, for directed verdicts as to each count of the indictment.

*First.*—In each count of the indictment the defendant was charged with misappropriation of public funds in his capacity as "acting deputy collector of Pulaski county." Prior to trial the prosecuting attorney, by leave of the court, amended by describing appellant as "chief deputy sheriff." The amended indictment was demurred to on the ground that the substituted description of the defendant's official position did not relate to a matter of form, ". . . but was an affirmative charge

in a matter of substance, which charge was in direct conflict with the charge made by the grand jury, and the state is without power or authority to amend the original indictment in such manner." The demurrer was overruled.

In urging his exceptions appellant says that under Amendment No. 21 to the Constitution prosecutions may be by indictment or information; but, it is insisted, Amendment No. 21 does not authorize amendments to indictments, and at common law no such right existed. Authorities cited are shown in the footnote.[1]

Appellant concedes that Initiated Act No. 3 (Pope's Digest, § 3853), authorizes prosecuting attorneys, with leave of the court, to ". . . amend an indictment as to matters of form or [to] file a bill of particulars." But the same section contains the restriction that ". . . no indictment shall be amended, nor bill of particulars filed, so as to change the nature of the crime charged or the degree of the crime charged."

Section 3836, Pope's Digest, (which is not a part of Initiated Act No. 3) reads as follows: "No indictment is insufficient nor can the trial, judgment or other proceedings thereon be affected by any defect which does not tend to the prejudice of the substantial rights of the defendant on its merits."

The question presented by the demurrer is whether the amendment to the indictment related to form, or whether it affected a matter of substance.

The nature of the crime charged to Collins—embezzlement—was not changed when the indictment was amended. The accused's capacity was re-described, but not to his prejudice. There was no variance between the indictment, as amended, and the proof, even though the defendant did, in part, embezzle money intended for the sheriff, and in part intended for the collector. The sheriff was ex officio collector.[2] The accounts to which the misappropriated funds were apportionable were of no controlling importance in the instant case, each specific

---

[1] *State* v. *Springer*, 43 Ark. 91; *Hill* v. *State*, 185 Ark. 379, 47 S. W. 2d 31.
[2] But see act 137 of 1939.

item having been traced to Collins, who officially received and personally retained the money. *Baker* v. *State, ante* p. 688, 140 S. W. 2d 1008.

*Second.*—What we have said in respect of the exceptions urged against amending the indictment disposes of the contention under this heading. The state filed a bill of particulars in which the defendant was informed of the range the testimony would take. The appellant admitted that he was custodian of moneys intended alike for the sheriff and for the collector.

*Third.*—Counsel for appellant, in their brief, state that assignment No. 3 is merely a follow-up of exceptions taken to the amendment to the indictment.

*Fourth.*—Throughout the record runs the thread of suggestion, inferentially made, that the sheriff was not free from blame. Therefore, defendant's motion that the sheriff and the coroner and their deputies be disqualified as court attendants, was granted. Affirmatively, it was prayed that ". . . special deputies, or commissioner or commissioners, a citizen and elector, or citizens and electors, of good repute, above suspicion, and without bias or interest in the outcome of this cause, be appointed or commissioned to summon the jurors in this cause, and to attend and wait upon the panel, to do whatsoever the law or necessity requires in the premises herein."

Members of the state police were designated as special deputies. By § 3982 of Pope's Digest it is provided that "The court may, for sufficient cause, designate some other officer or person than the sheriff to summon jurors, the officer or person designated being first duly sworn in open court to discharge the duty faithfully and impartially."

In view of appellant's request for disqualification of the sheriff and coroner, we think the objection captious, and there is no showing of prejudice.

*Fifth.*—It was alleged in defendant's motion to quash the jury panel that the members had been selected and summoned by the sheriff, "who had an interest in

the outcome of this case; that they had, during the term of court, been in constant and almost daily association with the sheriff and his deputies, and that the members of the panel were not representative of the citizenship of Pulaski county, but twenty-three of the twenty-four members of the regular panel, and all twelve of the alternates resided in the city of Greater Little Rock." The motions were overruled.

There is complete absence of proof that selection of the regular panel and alternates was designedly confined to citizens of a particular locality; nor is there allegation that influence was exerted upon the veniremen, or that any of them was chosen because of interest in the result of the trial.[3]

Pope's Digest, § 8314, provides that the jury commissioners "shall . . . select from the electors of [the county in which the trial is conducted] such numbers as the court may direct." In summing up his objections under the fifth assignment, appellant says: "All in all, viewed against the whole background, the situation does not look just exactly right."

*Sixth.*—It is objected that after eleven jurors had been accepted by the court, by the state, and by the defendant, and had taken their seats in the jury box, and after the defendant had exhausted all of his challenges, C. C. Hester, one of the jurors who had been so accepted, said that ". . . by marriage some way my wife and Mrs. Charles McNutt[4]—they are not related— have known each other for a long time." Hester said he did not think this circumstance would affect the outcome of the case or impair his judgment. The court, however, excused him. The defendant saved his exceptions. The court offered to allow the defendant an extra challenge.

*Williams* v. *State*, 63 Ark. 527, 39 S. W. 709, is relied upon by appellant. The court said: "We have failed to find a case where the error complained of has been

[3] Terry v. State, 149 Ark. 462, 233 S. W. 673.

[4] McNutt was associated with the defendant and at the time of this trial was under indictment, charged with embezzlements similar to those for which Collins was being tried.

held not prejudicial, where jurors are yet to be selected, and the defendant has exhausted his challenges.'' In the case at bar the state proposed to permit the defendant to use one of its challenges on any venireman who should be examined as a substitute for Hester. The Williams Case seems to be predicated upon the court's inability to determine whether the defendant was prejudiced by discharge of jurymen in circumstances somewhat similar to those here discussed. It was then said that ''. . . we cannot say that it was not detrimental to him, and in fact we are rather inclined to think it was.''

We are unable to see how Collins could have been prejudiced by action of the court in excusing a juryman who said he would not be influenced by the fact of his wife's friendship for the defendant's official associate who was under indictment. The defendant had no absolute right to the services of any particular juror,[5] and we are not willing to say that judicial discretion was abused.

*Seventh.*—The contention under this heading is that the court erred in admitting evidence of similar offenses which were not set out in the bill of particulars. Palmer Taylor testified that two state warrants payable to the sheriff (items not specified in the indictment as originally returned, as amended, or in the bill of particulars) had been issued, and Joe Bond, certified public accountant, testified these warrants were cashed by the defendant and the proceeds not accounted for. Counsel for Collins insisted such evidence was incompetent, irrelevant and immaterial; that it pertained to separate and independent offenses having no connection with the crimes charged; that no general scheme or design had been alleged, and that proof relating to such warrants would shed no light upon the subject-matter of inquiry.

If, as appellant insists, these transactions were unrelated to the offense of embezzlement, and there was want of proof that the defendant's conduct was continu-

[5] *Vaughan* v. *State,* 58 Ark. 353, 24 S. W. 885; *Pate* v. *State,* 152 Ark. 553, 239 S. W. 27.

ous and that no systematic plan of appropriating public funds existed, the objections would be tenable. The evidence destroys the basis upon which the claim of privilege from inquiry is asserted.[6]

*Eighth.*—Did the court err in denying appellant's request for permission to use, in the cross-examination of Joe Bond, "the audit or memoranda prepared by said witness and used by him in his direct examination to refresh his memory?"

Appellant has not abstracted his motion for a new trial. By reference to the record it will be seen that the fourth assignment is that the court erred "in denying the motion of defendant for permission to inspect the audit and summary of Joe Bond prior to the trial." Apparently this assignment has been abandoned on the theory that what occurred before the grand jury was not an issue to which exceptions could be taken if the indictment alleged an offense within the jurisdiction of the court.

Two audits were before the grand jury: one prepared under the supervision of J. Bryan Sims, chief county accountant of the state auditorial department, whose excellent work over a period of more than twenty years has reflected great credit upon his intelligence, industry and fidelity; the other (and more recent) prepared by Joe B. Bond.

Charles E. Ratcliff, Jr., of the state auditorial department, testified that a report filed by the comptroller's office disclosed a shortage of $22,896.86 for 1937 and 1938. He stated that no effort was made to ascertain personal responsibility "so far as the individual was concerned."

The record reflects that Joe Bond, a certified public accountant of known trustworthiness and fine ability, was employed to make an "internal" examination cover-

6 See *Stormes* v. *State*, 81 Ark. 25, 98 S. W. 678; Underhill on Criminal Evidence, 4th Ed., § 492, page 1009; *Bledsoe* v. *State*, 130 Ark. 122, 197. S. W. 17; *Monk* v. *State*, 130 Ark. 358, 197 S. W. 580; *Speer* v. *State*, 130 Ark. 457, 198 S. W. 113; *Holden* v. *State*, 156 Ark. 521, 247 S. W. 768; *Bohannon* v. *State*, 160 Ark. 431, 254 S. W. 683; *Yelvington* v. *State*, 169 Ark. 359, 275 S. W. 701; *Warford* v. *State*, 175 Ark. 878, 1 S. W. 2d 23; *McCauley* v. *State*, 177 Ark. 1031, 9 S. W. 2d 236.

ing the sheriff's own records. Mr. Bond stated that the results shown by his audit, and the shortage charged to the sheriff and collector by Mr. Sims' audit, were virtually the same. There was a stipulation that records from the sheriff and collector's office should be considered in evidence, but not introduced. However, numerous original records appear in the bill of exceptions.

As described by Bond, taxes were collected by deputies in the "front office" of the collector's suite of offices. These deputies, or receiving tellers, made daily reports which were balanced with their collections. Chief Deputy Collector Weir kept keys to the various machines used in recording receipts, and was the only employee who knew the total amounts registered. He checked all collections against reports of the tellers, and each teller filed with the "back office" a copy of his report, and transmitted the money collected. Appellant and Charles McNutt were the only two deputies in the so-called "back office," and all moneys received from the tellers were supposed to be delivered to them. Copies of the tellers' daily reports were furnished a distribution clerk in the front office, who took the totals and prepared a distribution sheet showing how apportionments were to be made. This distribution sheet was filed with Collins and McNutt. All books and permanent records—including evidences of bank deposits, etc.—were kept in the back office by appellant or McNutt.

Other than receipts by the collector on account of tax payments, emoluments accruing to the sheriff's office were handled from day to day by a process deputy. His report was similar to that of the collector's tellers, and it, together with receipts, was delivered to appellant and McNutt. During 1937 and 1938 $4,938,913.84 was collected, all of which, except $485.41, was received by the back office.

The first count of the indictment charges appellant with withdrawal of $100 in currency from the collections of J. H. Belford, a receiving teller, and an unexplained deposit by appellant the same day. Belford's original

settlement sheet for April 13, 1937, showed that during the day he collected checks aggregating $4,926.77; currency amounting to $373; silver amounting to $1.85, and that he charged "tickets" with $100—a total of $5,401.62. The original report is in evidence as Exhibit "C." Appellant's personal bank statement for April 13 shows that he took credit for $100. The bank's deposit slip evidencing this credit shows that currency was handled. A summary of the tellers' settlements for April 13, made by McNutt, shows that the item of $100 listed as "ticket" was withheld from a deposit of the day's collections, and that the deficiency was charged to a cash account. The summaries made by McNutt were entered in the cash journals, showing day-to-day deposits, and revealing the amounts withheld and charged to cash. The difficulty was that when the audit was made the cash was not on hand.

Mr. Bond testified that three men, and three only —Sheriff Branch, appellant Collins, and Charles McNutt—had access to the money after it had been accounted for by the tellers.

The second count of the indictment alleges that August 24, 1937, appellant withdrew $25 from the collections of David McLees, teller. It was accounted for in a manner similar to that described in respect of count No. 1.

The third count charges embezzlement of warrant No. 264254, dated July 5, 1938, for $160. This warrant was on a voucher issued by the clerk of the Supreme Court in payment of services due for deputy sheriff attendance upon the court. It bore appellant's indorsement and was cashed by appellant at the Peoples National Bank. Bond's testimony is to the effect that the money was never deposited to the sheriff's emoluments account and there was no evidence that it was otherwise received.

The fourth count alleges embezzlement of $658.65, representing parts of fines paid by a deputy circuit clerk. Appellant admitted receipt of the money. Bond's testimony was: "This amount of money was never entered

on the books, never reported to the process deputy, and never deposited in the bank—and, of course, not accounted for when the audit was made."

The fifth count charges embezzlement of $37.32. L. G. Becoulet paid this amount to appellant in settlement of his taxes. No official receipt was issued, nor were the taxes marked paid. The money was not accounted for.

Appellant's testimony was a general denial that he intentionally took any of the public fund.

The evidence was sufficient to sustain conviction.

The most serious objection is that appellant was denied access to memoranda from which Accountant Bond testified. The so-called "internal" audit made by Bond was requested by the grand jury, and its cost —$1,500—was paid by the county and charged to the prosecuting attorney's contingent fund. During direct examination of the accountant, counsel for appellant asked what the witness was testifying from. The reply was, "Information taken from the reports." The record discloses the following questions and answers: "Q. You are not testifying from the reports? A. I can if you wish me to, I have them here. Q. I will ask you if you are testifying now from a summary you yourself made from the original records? A. From an analysis I made myself. Q. And you have that compiled in one volume? A. Yes, sir."

*Mr. Mehaffy* (prosecuting attorney): "Q. You are using that as a basis for your testimony, refreshing your memory? A. I have refreshed my memory. Q. Do you have in the court room the original records?"

*Mr. Coulter* (of counsel for appellant): "I am not raising that question with that information."

Later, during the course of the direct examination of witness Bond, the following took place:

*The court*: "Mr. Coulter says it is agreeable with him for the witness to use his summary. You may give him a list of the dates and he can go over each one without the questions being asked."

*Mr. Mehaffy:* "Q. Go ahead without my asking question?"

*Mr. Coulter:* "Now, Mr. Bond, mark those on the records so that I can keep up with them when I cross-examine you."

*Mr. Mehaffy:* "That record—"

*Mr. Coulter:* "Yes, sir, mark them with a lead pencil so I can keep up with them when I cross-examine you."

*Mr. Mehaffy:* "If the court please—"

*The court:* "There is no use in bringing up that question now."

*Mr. Coulter:* "I will stipulate he may use the summary before him."

During the course of the cross-examination of witness Bond by counsel for the defense, the following took place:

*Mr. Coulter:* "Q. I believe you stated on your direct examination that you had made an audit of the affairs of the office of sheriff and collector of Pulaski county covering these particular years, which audit you termed an internal audit of the affairs of this office? A. Yes, sir, that was a term to more exactly describe it. Q. The purpose of that audit was to determine insofar as it was possible to do so where the shortage of some $20,000 went? A. Yes, sir. Q. When did you begin work on that audit, Mr. Bond? A. Sometime in July, I believe, I wouldn't be sure about that. Q. Of 1939? A. Yes, sir. Q. How long did you continue in that work before you completed your audit? A. About seventy days. Q. Do you remember when that audit was completed? A. Not exactly, I do not; approximately three months after I began the work. Q. Did you compile a summary of your findings as a result of that audit? A. Yes, sir. Q. Have you had that summary in your hand on the witness stand, and have you been using it by way of refreshing your memory in referring to the other books and records and testifying in this cause? A. Yes, sir. Q. You didn't file a copy of that audit in your

testimony before the grand jury? A. Yes, sir. Q. You mean you filed a complete copy of the audit? A. Yes, sir. Q. Now you have a copy of it in your hand on the witness stand? A. Right. Q. That is the document to which you have made repeated reference in your testimony by way of refreshing your testimony? A. Yes, sir. Q. Might I, by way of refreshing my memory and keeping up with your testimony of this morning, see the summary you have on the desk there?"

*Mr. Mehaffy:* "What is the question?"

*Mr. Coulter:* "I asked if I might, by way of following his testimony of this morning and refreshing my memory the way he has been refreshing his, have access to the summary he used."

*Mr. Mehaffy:* "I object, Mr. Coulter, of course, knows that is grand jury testimony and not admissible."

Following Prosecuting Attorney Mehaffy's objection a hearing was conducted in chambers. The court ruled that the defendant did not have a right to examine the audit summary.

Was this error?

The questions and answers (which for clarity have been copied at length) show that the original records were available, and that counsel for appellant consented that the analysis or summary might be used in order to expediate the examination. For example, after Bond had stated, "I have refreshed my memory," and had told Mr. Coulter the original records were available, the attorney stated, "I am not raising that question with that information."

Clearly, Mr. Coulter meant by this declaration that after being informed the primary evidence was at hand, he would not question Bond's right to refresh his memory from the audit summary. Again, Mr. Coulter said: "I will stipulate he may use the summary before him."

On cross-examination, after waiving any objection to Bond's reference to the memoranda, there was an effort to raise the issue again. It was then too late. Having conceded that the summary might be used by the

witness, and having failed to attach as a condition to the concession a requirement that he be permitted to examine the document during cross-examination, the court's action in refusing appellant's demand, coming at the time it did, was not prejudicial.

*Ninth.*—The witness Bond was asked:—''Taking into consideration Mr. Branch's bank account and the money found there, I will ask you whether or not, after allowing credit for his salary and for all other incomes which you could trace, if there was a difference left there between that amount and the amount he put in the bank? A. I had no knowledge of any income Mr. Branch had outside of his salary. I understand he was in the farming business, and rented, too. His deposits considerably exceeded his salary as sheriff for the two years. Q. Would you mind stating to the best of your recollection what the deposits were? A. Just a guess, after excluding deposits that arose from notes, and deposits that arose from salary, I think he possibly had $37,000 that was in cash.''

This answer, as abstracted by the state (brief page 37), reads: ''. . . I can possibly say he had $37,000 that was *not* in cash.'' [Italics supplied.]

The substitution was, presumably, inadvertent. However, as affecting the case at bar, the discrepancy is unimportant. The defendant's object in demanding access to the audit was to show that persons other than himself had access to moneys received for the public account.

While we think it would have been better to permit appellant to inspect the audit, no error is shown. Appellant was convicted upon specific counts alleging definite transactions, each of which was traced in a convincing manner. Testimony as to the system observed in the sheriff and collector's office was merely incidental to the identified acts of embezzlement. Bond testified, without objections, that Branch had access to the funds. This information was not denied the jury. That the jury might have believed that money traced to appellant was taken by Branch is not availing in the light of Bond's

testimony in chambers that he did not know the sources of the sheriff's income.

Irrespective of the trial court's belief that the Bond audit was confidential to the grand jury, it is a public document, paid for with public funds, and available to any citizen for inspection at any reasonable time in the office of the circuit clerk, who is hereby directed to treat it as any other public record.

It is true, as we said in *State* v. *Fox*,[7] that the grand jury is an inquisitorial body, the proceedings of which are intended to be kept secret, and cannot be examined and reviewed by a trial court upon a motion to set aside or quash an indictment, except for cause specified by the statute. Every member of a grand jury must keep secret whatever may have been said by any of its members, and also must treat as confidential the manner in which the members have voted. A grand juror may not be questioned about anything he has said or any vote he may have cast, save for a perjury he may have committed in making accusation or giving testimony before his fellow jurors.[8]

These statutory mandates, as construed by the decisions, *supra*, are for the protection of the grand jurors and in furtherance of orderly administration of our criminal laws. They serve, also, to shield the innocent who may be witnessed against in circumstances where an indictment or presentment fails.

Conversely, the public's right of access to an audit relating to the collection and disposal of nearly five million tax dollars—an audit for which fifteen hundred dollars of county money was judiciously spent—cannot, under any statute or rule of construction, be questioned. All of the information contained in the report is taken from records authorized to be kept for official purposes, or from entries made elsewhere at the instance of those entrusted with prescribed duties who violated the confidence imposed in them. To hold that when such information has been gathered, explained so convincingly that in-

---

[7] 122 Ark. 197, 182 S. W. 906.

[8] *Nash* v. *State*, 73 Ark. 399, 84 S. W. 497.

■■■■■■

dictments for embezzlement are predicated upon its accuracy, and thereafter convictions are had—to say that the general welfare is best served by consigning to oblivion the details so painstakingly portrayed by a highly trained and sincere accountant, is to lose sight of the paramount interest so inconspicuously represented by the humble taxpayer. This is not, and never was, the purpose of the law.

The judgment is affirmed. The audit is adjudged to be a public record, and as to it (because of the principle involved) this court's mandate shall issue immediately. It is so ordered.